**Ulis Lando PENNINGTON, Petitioner-Appellant,**

**v.**

**Dr. George BETO, Director, Department of Corrections, Respondent-Appellee.**

**No. 29731.**

United States Court of Appeals, Fifth Circuit.

Feb. 5, 1971.

David McAtee, Dallas, Tex., for petitioner-appellant; Thompson, Knight, Simmons & Bullion, Dallas, Tex., of counsel.

Crawford Martin, Atty. Gen., Howard M. Fender, Asst. Atty. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Robert C. Flowers, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RIVES and SIMPSON, Circuit Judges, and NICHOLS*, Judge of the Court of Claims.

SIMPSON, Circuit Judge:

We review on this appeal the denial of habeas corpus relief to a Texas state prisoner, Ulis Lando Pennington, after hearing by the federal district court. We consider the hearing held to have been overly restricted and the findings thereon inadequate. Accordingly, the case is remanded for further proceedings in the district court.

The substance of appellant Pennington's claim is that Texas courts denied

* Honorable Philip Nichols, Jr., sitting by designation.

him Fourteenth Amendment due process of law because his court-appointed trial counsel was ineffective to the degree that his trial and conviction constituted a travesty of justice.

Pennington was awakened and arrested on January 13, 1966, while sitting in the front seat of a parked automobile, later proved to be stolen. The car was parked off the traveled portion of a highway near Dallas, Texas. In April 1966 he was convicted in a Dallas Criminal District Court for theft of corporeal personal property valued at over $50.00 (the automobile). The state proved that appellant then had two previous felony convictions, and he was sentenced to life imprisonment as an habitual criminal.[1]

Pennington sought to account for his presence in the car by relating the following. He claimed that at 8:30 a. m. on January 12, 1966, he went to the Pastime Bar in Dallas, Texas. While waiting to meet his estranged wife he began drinking steadily. He entered into conversation and had drinks with a man in the bar who identified himself only as a construction worker for Cecil Ruby Company. Appellant and the stranger left the bar in a car which the unknown man said belonged to him. Pennington rode on the passenger side of the automobile. During the trip to the next bar, appellant asserts that he took several drinks of whiskey and became unconscious. When he awoke he was sitting in the automobile and the police were present. Pennington was initially charged with being drunk in the automobile. Later, when the authorities discovered that the car was stolen, the charges were changed to theft.

A Dallas attorney was appointed by the court to represent the appellant. Pennington contends that he related his story to counsel, as well as a description of the unknown man and the information that the man was thought to work at the Cecil Ruby Company. It is also asserted that Pennington told his attorney that the bartender at the Pastime, a man named George, could verify the fact that the petitioner left the bar with the unknown man. Pennington also gave the attorney the names of several relatives located at Greenville, Texas, that might serve as character witnesses.

The court-appointed attorney was a 1964 law school graduate, admitted the same year to the Texas bar. He was an F.B.I. special agent for eight years before he entered law school. At the time of petitioner's trial in 1966, the attorney had been practicing law generally from 1964 to 1966 with emphasis in the area of criminal law. At the time of this appointment he had handled approximately 15–20 felony trials.

The following testimony of the appellant at the federal habeas hearing is relevant to our inquiry:

Q How many times did Mr. Harrison see you prior to trial?

A I recall three times, sir.

Q And about how long, all together, did he spend with you during all those three times?

A Not no longer than fifteen minutes.

Q Fifteen minutes apiece?

A Not any longer, maybe twenty minutes on some of them and fifteen on the others.

Q Did you relate to Mr. Harrison your story about the man at the bar and the car?

A Yes, sir.

Q Did you describe this man to Mr. Harrison by way of working for Cecil Ruby?

A Well, I tried to, he told me there was no use, he didn't think it would do any good.

Q Did you tell him about George, the bartender?

A Yes, sir.

1. Under Vernon's Ann.Texas Penal Code, Article 63, which provides:
"Whoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary".

Q Did you ask him to contact George, the bartender?

A Yes, sir, I did.

Q Were these people ever subpoenaed as witnesses in your behalf?

A No, sir. (Tr. pp. 12–13)

\* \* \* \* \* \*

Q Did you ever give Mr. Harrison a description, a physical description of the man that you say was driving the car in which you were subsequently found and charged with stealing?

A Not a full description, I tried to, but he stopped me and he said there would be no use and it wouldn't do any good anyway.

Q Do you remember how much of a description you managed to give him?

A Yes, sir, after I told him the man's age, and I told him also his name, you know, what I mean, the name of the man, not the name of the man that drove the car, but who he kind of favored.

Q Did you tell Mr. Harrison where the man was employed that you say was driving the car?

A Yes, sir.

Q I forgot, where was that?

A Cecil Ruby Company.

MR. FENDER: I didn't understand, what was that?

MR. McATEE: Cecil Ruby Company.

THE WITNESS: That's what he told me. (Tr. pp. 37–38)

Also germane to the issue is the following testimony of the court-appointed attorney:

Q Fine. Now, would you relate to me the substance of your first meeting with Mr. Pennington?

A Yes, sir. As I recall, I received a telephone call from Miss Romey Bird, I see from going through my file here, stating that I had been appointed to Mr. Pennington's case. And in a few days after I received the telephone call, I went to visit with Mr. Pennington in the County Jail. And I visited with him on approximately three to five occasions prior to the trial in question.

Q You can't recall whether it's three or five?

A Well, I wrote a letter to Mr. Pennington, if I may just give you this. Mr. Pennington wrote a letter to the Grievance Committee, and I was contacted by Mr. Burleson, and I reconstructed the facts in a letter to Mr. Burleson, and in reading my letter, I visited with him, as I recall, on March 4th, March 31st and April 25th, prior to the trial, and I believe I visited with him on one or two other occasions.

Q During these meetings, what did Mr. Pennington relate to you as to his version of the events surrounding the alleged automobile theft?

A From my original notes which I have dated March 7th, 1966, Mr. Pennington advised me that he was a 35-year-old white male, that he was single and had been divorced approximately three months from his wife, Elizabeth Thomas. He stated to me that his first wife was a Lula Mae Buchanan, and they had a boy named Ricky Lee, age 7. He advised me on the night that he was arrested or the night previous to the date he was arrested, he and his ex-wife had had an argument, and they had been drinking at the Pastime Lounge on Ervay Street. He stated he and his ex-wife had had a fight, and she got in a cab, and he tried to follow her, but he couldn't. He stated he went back to the tavern, and he was very speculative as to what happened, because he was drunk. At this time he met someone who he didn't know, some friend who asked him to go someplace on Harwood. He recalled getting in this other person's car. At this time this unknown friend asked him if he wanted a drink from his pint, and Mr. Pennington stated he had two or three good drinks, and then blacked out. The next thing he remembered was sitting in the car beside the highway, and the police picked him up, and he didn't recall getting in the car, and he was then charged with auto theft. He advised me he had two previous burglaries and that he had served time in the penitentiary for those. He told me

**1284**

a man by the name of George at the Pastime Tavern could verify that he was drinking there and had left with another man, and that's all he recalled.

Q Did you seek to get in touch with the man that drove the car, and George, the bartender at the Pastime Tavern?

A Well, I had no description of George, I had no idea who the other person was in the car. I did call the Pastime Lounge and talk to a person there, and as I recall, they didn't know Mr. Pennington. I asked about his ex-wife and as they recalled, she very seldom came in there, and they didn't know where I could get in touch with her, and Mr. Pennington did not know where she lived.

Q Is it your testimony then that you did not find George, the bartender, nor speak with him?

A It wasn't George the bartender, just some man named George.

Q Did you speak with a man named George?

A Mr. Pennington told me he was with some man named George, I never did find out.

Q Okay. What witnesses, if any, did you talk to prior to the trial?

A None.

Q None?

A None.

Q Did you serve a subpoena on anyone?

A No, sir, I didn't.

Q What other steps and investigation did you make other than the ones you have outlined to me?

A Mr. Pennington told me about some friends, cousins that lived in, I believe it was, Greenville, and although they had no relevance to the case, I did try to call them. I called a number of numbers in Greenville and I talked to two or three friends of his at Greenville who could not come to the trial. I told them of the seriousness of the charge, and if they could possibly come to Dallas, to come to Dallas and appear as character witnesses in his behalf or to help him in some way, and they just weren't really interested.

Q Did you not then decide or did you then decide not to subpoena these people although they were needed as character witnesses?

A I really didn't see as how it would do any good.

Q Would you clarify that, Mr. Harrison? Do any good as what?

A They knew nothing about the case.

Q Did they know something about Mr. Pennington's character?

A Well, this was an habitual trial, and once the jury finds out, after the jury goes out and finds innocence or guilt, and once the jury finds out as to the other convictions he's got, all the character witnesses in the world isn't going to do him any good.

Q Turning more specifically to trial preparation at this point and to motions, did you research any cases on this factual situation?

A I did some research and I think I filed some.

Q Did you research any cases relating to the question of whether a finding of mere possession of property allegedly stolen is sufficient to convict?

A. No, sir, at that time I didn't. Subsequent on the appeal, I did.

Q You did not investigate this prior to trial?

A No, sir. (Tr. pp. 24–28)

At the hearing in the district court the appellant's habeas counsel read the following narrative into the record over the objection of opposing counsel:

MR. McATEE: Okay, Your Honor, we would make a bill of exception on this evidenciary (sic) ruling, and would introduce the following testimony that has been excluded: that it would be my testimony that upon calling this Pastime Tavern and making this inquiry, I was subsequently placed in touch with a man by the name of J. A. Jordan, who identified himself to me as the past owner of

the Pastime Tavern, that he was the owner for some 13 years, he told me that he recalled Mr. Pennington and that he could not recall the specific night, but that he was available during that period of time. That is the substance of the testimony other than he did identify himself as the man, commonly known as George, and the owner of the Pastime Bar at that period of time. That is the substance of the testimony and we renew our request that it be admitted in evidence in this cause. (Tr. pp. 42–43)

We believe that the record was not such as to permit the court below to reach an informed decision as to the effectiveness of Pennington's trial counsel. Although the record discloses some references to inadequate preparation and research by trial counsel, the main thrust of the appellant's ineffective counsel claim is that witnesses who may have been helpful to the defense were not investigated or called to testify on behalf of the appellant. The district court noted however that the witnesses whose testimony the appellant claims was essential at trial were available at the time of the habeas hearing but were not then called to testify. Finding no other persuasive evidence conducive to a ruling in favor of the petitioner the district judge concluded that he had not met his burden of proving that the assistance of counsel was so ineffective as to render the trial a farce, sham, or mockery of justice, citing Williams v. Beto, 5 Cir. 1965, 354 F.2d 698.

It appears from the proffered but excluded narrative of Mr. McAtee that the person called George, Mr. J. A. Jordan, had been located at the time of the habeas hearing. The record is unclear as to the availability of the persons whom appellant claims would have spoken for him as character witnesses. Certainly testimony of these persons may have been most highly relevant herein to the claim of ineffective assistance of counsel. Their availability vel non should have been established and they should have been called at the habeas hearing if available. Their knowledge, not alone as to Pennington's reputation, but perhaps more importantly as to his drinking habits, may have been most helpful to the petitioner's case. The ex-wife and the present wife should have been contacted to determine whether or not their testimony as to Pennington's sobriety patterns would have been useful at trial. On remand a diligent endeavor should be made by the district court and counsel to procure the presence of these persons at a further hearing, so that their testimony as it bears upon this case may be taken. It will then be in order for the district court to make further findings and conclusions based on the supplemented record. The remand we require is based upon Walker v. Beto, 5 Cir. 1967, 387 F.2d 626, which required further consideration by the district court of the question of ineffective counsel. We intimate no opinion as to the decision the district court should reach after further hearing in compliance with this opinion. We call to the attention of the district court, for such relevance as they may have, the opinions of this Court in King v. Beto, 5 Cir. 1970, 429 F.2d 221, and Chalk v. Beto, 5 Cir. 1970, 429 F.2d 225.[2]

As already noted the lower court in the previous proceeding placed primary emphasis on Williams v. Beto, 5 Cir. 1965, 354 F.2d 698, as the standard by which to measure the constitutional adequacy of court-appointed counsel. We

2. *King* and *Chalk* each involved a charge of ineffective counsel. In support of those charges, both petitioners attempted to show, inter alia, that readily-available witnesses who would have aided the defense cause were not interviewed or called to testify. The district court found that the petitioners had thereby been denied the effective assistance of counsel, and we affirmed the findings of the district court.

However, we reiterate the point made in footnote 1 of *King* that "each case involving the constitutional issue of effectiveness of counsel depends on the facts— the specific conduct of the parties involved."

suggest that the district court on remand should consider also our landmark case, MacKenna v. Ellis, 5 Cir. 1960, 280 F.2d 592, and its progeny as well as *Williams* in judging the effectiveness of counsel. In Brown v. Beto, 5 Cir. 1967, 377 F.2d 950, citing *MacKenna*, we said:

"The actual standard of incompetency applied by the overwhelming majority of courts is stated as follows: Incompetency of counsel such as a denial of due process and effective representation of counsel must be such as to make the trial a farce, sham, or mockery of justice. [Citation omitted.] *This Court* has defined 'effective counsel' in terms of a 'reasonable counsel' standard: 'We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.' MacKenna v. Ellis, 5 Cir. 1960, 280 F.2d 592." 377 F.2d at 957–958. (Emphasis added)

In this regard, see also United States v. Rubin, 5 Cir. 1970, 433 F.2d 442; Caraway v. Beto, 5 Cir. 1970, 421 F.2d 636.

For further proceedings consistent with this opinion, this case is remanded to the court below.