John Lewis WASHINGTON,
Petitioner-Appellant,

v.

John C. WATKINS, Commissioner, Mississippi Department of Corrections, et al., Respondents-Appellees.

No. 80–3072.

United States Court of Appeals,
Fifth Circuit.

Unit A

Sept. 14, 1981.

Rehearing and Rehearing En Banc
Denied Dec. 3, 1981.
See 662 F.2d 1116.

Patrick Dale O'Rourke, Jackson, Miss., Grady F. Tollison, Jr., Oxford, Miss., Anthony G. Amsterdam, Stanford Univ. Law School, Stanford, Cal., James S. Liebman, Joel Berger, John C. Boger, Judith Reed, Deborah Fins, New York City, for petitioner-appellant.

Billy Gore, Asst. Atty. Gen., Jackson, Miss., for respondents-appellees.

Before WISDOM, COLEMAN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

On May 25, 1977, a jury in the Circuit Court of Lowndes County, Mississippi, convicted Petitioner-Appellant Johnny Washington of capital murder for the March 26, 1977, shooting of Karl Woods during the armed robbery of a convenience store in Columbus, Mississippi. After finding Washington guilty, the jury returned a sentence of death.

Washington's conviction and sentence were affirmed on direct appeal to the Supreme Court of Mississippi. *Washington v. State*, 361 So.2d 61 (Miss.1978) (en banc), *cert. denied*, 441 U.S. 916, 99 S.Ct. 2016, 60 L.Ed.2d 388 (1979). After the Mississippi Supreme Court rejected additional arguments that Washington raised through a coram nobis petition, he petitioned the court below for a writ of habeas corpus under 28 U.S.C. § 2254 (1976). After holding an evidentiary hearing, the district court denied habeas relief in an unpublished opinion.

On appeal, Washington asserts a number of grounds for habeas relief; we reach only two. For the reasons set forth below in part II of this opinion, we affirm the judgment of the district court insofar as it held that Washington received effective assistance of counsel at his trial. For the reasons set forth below in part III of this opinion, however, we reverse the judgment of the district court insofar as it held that the sentencing phase of Washington's trial comported with the Constitution despite jury instructions that limited sharply the mitigating circumstances which the jury could consider in determining whether Washington should be sentenced to death. Accordingly, we remand the case to the district court with instructions to enter judgment granting appropriate habeas corpus relief.

## I. FACTUAL BACKGROUND LEADING TO THIS APPEAL

Washington's trial was neither lengthy nor especially complicated. The Mississippi Supreme Court's opinion from Washington's direct appeal accurately summarizes the evidence presented at the trial:

Woods Quick Pick, a Columbus, Mississippi, convenience store, was robbed on the night of March 26, 1977, by two men armed with shotguns and wearing stocking masks. During the robbery, one of the bandits, later identified as Johnny Lewis Washington, at close range shot J.K. [Karl] Woods, the proprietor of the store, in the stomach with a long-barrel shotgun loaded with buckshot. Woods died about five hours later in a Columbus hospital.

Booker T. Cole, Jr. testified that between 7:30 and 8:00 P.M. on March 26, 1977, Johnny Washington contacted him and told him to come by his house because "he had something up." Some time later, when Cole arrived at Washington's house, the defendant told Cole that they were going to rob [the] Quick Pick. Washington provided Cole with a stocking mask and a sawed-off shotgun, and they took up their station across the street from Woods Quick Pick. After assembling and loading their shotguns, when the coast was clear they ran across the street and into Woods Quick Pick store. J.K. Woods, owner of the store, Roy Thompson, an employee, and a female employee, Elouise Clark, were in the store. [Thompson testified that Woods had been drinking prior to the robbery, and was somewhat intoxicated at the time.]

Cole and Washington pointed their shotguns at Woods and Thompson, and told them to open the cash registers and "give us the money." Thompson began to put the money from the first cash register into a brown paper sack. Cole, the smaller and younger of the two robbers, found a bank sack of money in a cabinet drawer, and he fled with that sack.

Washington, in the meantime, ordered Woods to put the money from the second cash register into the same paper sack that Thompson had put the money from the first cash register. Woods misunderstood and reached for another paper sack, whereupon, according to the testimony of Thompson, Washington hit Woods over

the head with the gun barrel "just as hard as he could." In falling, Woods knocked Thompson's sack of money off on the floor. Washington told Thompson not to move and placed the shotgun about 8 inches from Thompson's head. Woods went ahead and picked up the sack and sacked the money from the second cash register.

As Woods handed Washington the sack in one hand, he reached for the gun barrel with the other, but missed, and Washington kept the gun on Woods as he, Washington, backed toward the door. Woods moved slowly toward Washington. Just before he left, Washington fired his shotgun into Woods' stomach. Washington reloaded his shotgun and left. Thompson testified that Washington and Woods were about 10 feet apart when Washington fired, and that Washington could very easily have made his exit with his sack of money without shooting Woods.

Cole testified that he was a short distance away when he heard the shot, and Washington came running out of the store telling Cole that he had shot Woods. Cole testified that later that night, about 12:30 or 1:00 A.M., they got together and divided the money (about $600) between them.

Washington's defense was that he was at a party [at his brother Freddie's apartment], was not at Woods Quick Pick, did not commit the robbery, nor did he kill Woods. [While several of the defense witnesses corroborated Washington's alibi,] [s]everal people at the party testified that Washington did not arrive there until around midnight . . . .

Ben Hodo of Ethelsville, Alabama, was visiting his grandmother in Columbus, Mississippi, on the night of the robbery. He testified that around 10:00 P.M., as he was going down to Lee's Restaurant to get something to eat, he saw a man in an alley next to Woods Quick Pick with a long gun and a sack full of money. Hodo testified that he and the man with the long gun looked at each other about 10 seconds and that they were close together. He positively identified Washington

as the one he saw in the alley with the sack of money and the long gun.

361 So.2d at 63–64. Another prosecution witness, Curtis Cobb, testified that he had seen Washington and Cole retrieve a shotgun and a money bag from some bushes later that night. Through police officers and other investigators, the State also presented some physical evidence that tended circumstantially to link Washington with the crime. The State also presented medical evidence as to the cause and manner of Woods' death. "After a full trial (the Record on the guilt phase consisting of 308 pages in two volumes), the jury returned a verdict of guilty of capital murder." *Id.* at 64.

In the separate sentencing hearing, both sides presented evidence as to mitigating and aggravating circumstances, to be considered in addition to the evidence adduced at trial. As additional evidence of aggravating circumstances, the State again called Thompson to the stand to testify as to the pointlessness of the shooting given that Washington could have made good his escape without firing.

In mitigation, Washington testified that he was 23 years old, that, while he had been living with a lady for about five years, he was not married but had a three-year-old daughter by her. When asked by his counsel whether he had ever been convicted of a crime, Washington replied that he had been convicted of a "marijuana crime that same year" for which he had paid a $400 fine.

*Id.* at 64. After receiving the trial court's charge for the sentencing phase of the trial, the jury returned the death sentence, finding (1) that Washington had committed the crime of capital murder while engaged in the commission of the crime of robbery, a statutory aggravating circumstance under Miss.Code Ann. § 99–19–101(5)(d) (1980 Supp.); (2) that Washington committed the capital murder "in an especially heinous, atrocious or cruel manner," a statutory aggravating circumstance under Miss. Code Ann. § 99–19–101(5)(h) (1980 Supp.); (3) that these two aggravating factors warranted the imposition of the death penalty; and (4) that there were insufficient mitigat-

ing circumstances to outweigh the aggravating circumstances. Accordingly, the trial court sentenced Washington to death.

As noted above, the Mississippi Supreme Court affirmed Washington's conviction and sentence, rejecting Washington's arguments that the "especially heinous, atrocious or cruel" language of section 99–19–101(5)(h) was unconstitutionally vague and that the death penalty is unconstitutional per se. 361 So.2d at 65–66. The court also determined that the evidence in the case supported the jury's imposition of the death penalty, and that this death sentence was not excessive or disproportionate to the penalty imposed in similar cases, characterizing the killing of Woods as "an especially wanton, willful, useless and cruel killing." Id. at 66–67. Finally, the court rejected Washington's contention that his sentence was imposed in violation of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). 361 So.2d at 67–68.[1] The United States Supreme Court denied certiorari, 441 U.S. 916, 99 S.Ct. 2016, 60 L.Ed.2d 388 (1979).

Washington then sought federal habeas corpus relief under 28 U.S.C. § 2254 (1976). The court below granted a stay of execution pending Washington's exhaustion of his state remedies as to certain claims that he had not made in his direct appeal. On the same day—May 25, 1979—the Mississippi Supreme Court summarily denied Washington's request for leave to file a petition for writ of error coram nobis in the state trial court in which Washington was convicted; thus, no hearing was ever held in

1. See note 53 *infra*.

2. Accordingly, 28 U.S.C. § 2254(d) (1976) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), have no direct relevance to the case at bar. Other than Washington's trial itself, there was never an evidentiary hearing in the state courts. *Sumner* emphasized that the presumption of validity created by § 2254(d) applies only "to cases in which a state court of competent jurisdiction has made 'a determination after a hearing on the merits of a factual issue.'" 449 U.S. at 546, 101 S.Ct. at 769. Here, however, Washington's *Lockett* argument is a purely legal one that depends upon nothing other than the transcript of his state-court trial; and as in *Via v. Super-*

the state courts on Washington's ineffective assistance of counsel claim.[2] The State does not contend on appeal that Washington has failed to exhaust his state remedies.

On recommendation of the United States Magistrate to whom the court below referred the case, the district court held a hearing on November 9, 1979, limited solely to Washington's ineffective assistance of counsel claim. After due consideration, the court concluded in an unpublished memorandum opinion that Washington had not been denied effective assistance of counsel. The court also rejected Washington's other asserted grounds for habeas corpus relief with respect to his death sentence. Accordingly, the district court entered judgment denying in its entirety Washington's petition for a writ of habeas corpus on December 18, 1979. This appeal followed.

## II. THE EFFECTIVENESS OF WASHINGTON'S COUNSEL

### A. The Standard by Which We Review a Federal District Court's Determination on an Ineffective Assistance of Counsel Claim

█ Every ineffective assistance claim must, at bottom, be founded on allegations of "what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators ...,'" *Townsend v. Sain*, 372 U.S. 293, 309 n.6, 83 S.Ct. 745, 755 n.6, 9 L.Ed.2d 770 (1963) (quoting *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.)).

*intendent, Powhatan Correctional Center*, 643 F.2d 167 (4th Cir.1981), virtually all of

> [t]he material facts relevant to the claim of ineffective assistance of counsel are not disclosed by the state trial record. They were developed at the federal evidentiary hearing. Under these circumstances, the requirements of 28 U.S.C. § 2254(d) are not applicable.

*Id.* at 169 n.3 (citing *Sumner*). Insofar as some few of the facts material to Washington's ineffective assistance claim are evidenced only by the state-court trial transcript—for example, whether counsel objected at a particular moment, or whether a witness gave certain testimony—those facts are undisputed in this appeal, and we accept them without question.

But every ineffective assistance claim also requires the application of principles of federal law to the "basic, primary, or historical" facts of the case. In *Walker v. Caldwell*, 476 F.2d 213, 216 (5th Cir. 1973), a panel of this court noted that "there is a legal standard, by definition normative and prescriptive, which must be applied to a particular set of facts in order to determine whether an accused received effective assistance of counsel." Accordingly, *Walker* held that "[t]he precise issue of whether a particular defendant enjoyed 'effective' assistance of counsel, is, in the end, . . . a question of *law*." *Id.* (emphasis in original). The *Walker* court determined that even if it accepted the somewhat questionable findings of basic, historical facts made in that case by the federal district court after an evidentiary hearing, the court below had erred in its ultimate conclusion that the defendant had enjoyed effective assistance of counsel.

When a federal district court conducts an evidentiary hearing in connection with an ineffective assistance claim, it ordinarily does so in order that it may determine disputed issues of basic, historical fact, which frequently hinge on credibility choices. Both before and after the *Walker* decision, this court has reviewed the district courts' findings on such issues of basic, historical fact under the "clearly erroneous" standard mandated by Fed.R.Civ.P. 52(a).[3]

By comparison, a long line of Fifth Circuit cases have held, consistently with *Walker*, that whether a defendant has received effective assistance of counsel is a "mixed question of fact and law," rather than purely a question of fact.[4] *E. g., Harris v. Oliver*, 645 F.2d 327, 330 n.3 (5th Cir. 1981); *Norris v. Wainwright*, 588 F.2d 130, 134–35 (5th Cir.), *cert. denied*, 444 U.S. 846, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Gray*, 565 F.2d 881, 887 & n.18 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978); *Trahan v. Estelle*, 544 F.2d 1305, 1314 (5th Cir. 1977) (Goldberg, J., specially concurring); *Mason v. Balcom*, 531 F.2d 717, 721–23 (5th Cir. 1976); *Lee v. Hopper*, 499 F.2d 456, 462 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 633, 42 L.Ed.2d 650 (1974).[5] Mixed questions of fact and law are not, as a general

---

3. *E. g., Fisher v. Wainwright*, 584 F.2d 691, 693–94 (5th Cir. 1978) (whether defendant's attorney told defendant he was prepared and willing to go to trial); *White v. Estelle*, 566 F.2d 500, 502 (5th Cir. 1978) (whether defendant's attorneys withdrew because defendant failed to keep appointments with them); *Bartelt v. United States*, 505 F.2d 647, 648–49 (5th Cir. 1974) (per curiam) (whether defendant's attorney told the defendant that he would not handle the defendant's appeal unless fees and new evidence were forthcoming, and whether defendant was aware that indigents are entitled to an appointed attorney on appeal); *Chalk v. Beto*, 429 F.2d 225, 227 (5th Cir. 1970) (whether quality of legal services accorded defendant was so poor that he did not have an opportunity to present his side of the story); *Caraway v. Beto*, 421 F.2d 636, 637 (5th Cir. 1970) (per curiam) (precise steps taken by defendant's attorney in investigating and preparing case); *Washington v. Smith*, 417 F.2d 301, 302 (5th Cir. 1969) (per curiam) (whether defendant was in fact represented by counsel when he entered his guilty plea).

4. The term "mixed question of fact and law" seems to be used interchangeably in our prior decisions with the term "ultimate fact" (as distinguished from "subsidiary" or "intermediate" facts).

5. *See also Hill v. Wainwright*, 617 F.2d 375, 380 (5th Cir. 1980) ("as a matter of law," defendant's counsel was not ineffective); *Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972) (per curiam) (declining to review under Rule 52(a) the district court's implicit factual finding that counsel's failure to interview alibi witnesses denied defendant the benefit of that witness, because "the district court erred *as a matter of law* in ruling that the undisputed facts failed to constitute ineffective assistance").

*Cf. Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980) (state courts' holding that attorneys representing codefendants did not engage in multiple representation was "a mixed determination of law and fact that requires the application of legal principles to the historic facts of this case," and hence was not entitled to a presumption of validity under 28 U.S.C. § 2254(d) (1976)).

These cases have often arisen in connection with the presumption of validity accorded under § 2254(d) to state-court factual findings that are implicated in a federal habeas corpus action brought under § 2254; however, we can conceive of no principled rationale for holding that effective assistance is purely a factual question when decided by a federal judge, but a mixed question of fact and law when decided by a state judge. *But cf. Lee v. Hopper*, 499

matter, reviewable under the clearly erroneous standard. *E. g., Baker v. Metcalfe,* 633 F.2d 1198, 1201 (5th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 2055, 68 L.Ed.2d 354 (1981) (reviewing district court's determination on state prisoner's double jeopardy claim brought through federal habeas corpus); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2589, at 753 (1971). Rather, as to the legal effect to be accorded the district court's findings of basic, historical fact, the court of appeals is free to substitute its own judgment for that of the district court. *Baker,* 633 F.2d at 1201.[6]

At least four recent Fifth Circuit cases, however, suggest that whether a defendant has received effective assistance of counsel is a purely factual question that is entitled to protection under the clearly erroneous standard of Rule 52(a). *See United States v. Hughes,* 635 F.2d 449, 451, 453 (5th Cir. 1981); *Pollinzi v. Estelle,* 628 F.2d 417, 418 (5th Cir. 1980) (per curiam); *Brown v.*

F.2d at 462 (treating state court's determination on effectiveness as a mixed question of fact and law not entitled to presumption of validity under § 2254(d), but treating federal district court's determination as one of pure fact, without explanation or citation).

6. *Cf. Brown v. Sibley,* 650 F.2d 760, 766 & n.8 (5th Cir. 1981); *Smith v. Farah Mfg. Co.,* 650 F.2d 64, 68 (5th Cir. 1981); *Danner v. United States Civil Service Comm'n,* 635 F.2d 427, 430–31 (5th Cir. 1981); *Thompson v. Leland Police Dep't,* 633 F.2d 1111, 1112 (5th Cir. 1980); *Causey v. Ford Motor Co.,* 516 F.2d 416, 420–21 (5th Cir. 1975) (all holding that court of appeals must make independent determination as to "ultimate fact" of unlawful discrimination, after first reviewing the district court's determination of requisite subsidiary facts under the "clearly erroneous" standard of Rule 52(a)); Youngblood & Folse, *Can Courts Govern? An Inquiry Into Capacity and Purpose,* in *Governing Through Courts* —— & nn.43–45 (R. Gambitta, M. May & J. Foster eds. 1981) (discussing in detail the widely varying positions of the circuits on this issue and the implications thereof).

7. *United States v. Hughes* cites only *Washington v. Smith* and Rule 52(a) itself. *Pollinzi v. Estelle* relies upon *Fisher v. Wainwright, White v. Estelle,* and *Bartelt v. United States. Brown v. Estelle* relies solely upon *Caraway v. Beto,* and *Jones v. Wainwright* relies solely upon *Fisher v. Wainwright.* As should be clear from the brief discussion of these precedents in

*Blackburn,* 625 F.2d 35, 36 (5th Cir. 1980) (per curiam); *Jones v. Wainwright,* 604 F.2d 414, 416–18 (5th Cir. 1979) (per curiam). None of these cases cites *Walker* or the other Fifth Circuit cases that have held that effective assistance is a mixed question of fact and law; rather, *United States v. Hughes, Pollinzi v. Estelle, Brown v. Blackburn,* and *Jones v. Wainwright* each relies solely on ineffective assistance cases[7] in which we have applied the clearly erroneous standard only to subsidiary questions of basic, historical fact—*i. e.,* to facts "in the sense of a recital of external events and the credibility of their narrators." Given the absence of supporting precedent for these four cases, and the presence of a long line of contrary Fifth Circuit precedent, the validity of these four cases must be questioned insofar as they hold[8] that a district court's finding on the ultimate question of whether a defendant received effective assistance of counsel is subject to review under the clearly erroneous standard.[9]

note 3, *supra,* none of them supports the proposition that whether a defendant has received effective assistance is a purely factual question subject to review under Rule 52(a).

8. *Pollinzi v. Estelle, Brown v. Blackburn,* and *Jones v. Wainwright* are less emphatic on this point than a cursory reading might indicate, and it may be that they only fail clearly to distinguish between their initial application of the clearly erroneous standard in reviewing subsidiary findings of basic, historical fact, and their subsequent, independent application of legal standards to those subsidiary findings in answering the ultimate question of whether the defendant received effective assistance of counsel.

9. Indeed, it appears that of late there has been a surprising amount of controversy as to which issues are mixed questions of fact and law, and which are questions of pure fact. *Compare Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (whether pretrial photographic identification procedures were so impermissibly suggestive as to give rise to a likelihood of irreparable misidentification is treated as question of fact entitled to a presumption of validity under § 2254(d)), *with id.* at 552–59, 101 S.Ct. at 772–75 (Brennan, J., dissenting) (arguing that constitutionality of identification procedures in that case was a mixed question of fact and law; "[p]lainly, the disagreement between the [state and lower federal] courts is

Faced with this possible conflict, we follow the longer established and more extensive line of precedent.[10] Accordingly, we hold that whether a defendant has enjoyed effective assistance of counsel is a mixed question of fact and law. While subsidiary findings of basic, historical fact that the district court has made after it has conducted an evidentiary hearing are subject to review under the clearly erroneous standard of Rule 52(a), the district court's ultimate conclusion as to whether the defendant enjoyed effective assistance of counsel is not subject to review under that standard, and the court of appeals must make an independent evaluation based on those subsidiary findings in determining whether counsel's representation satisfied the qualitative, normative standards dictat-

ed by the Sixth and Fourteenth Amendments to the Constitution.

### B. Constitutional Standards for Effective Assistance of Counsel

*1. The general legal standards.*—"In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S.Const. amend. VI. The Supreme Court has recently reemphasized that its decisions

make clear that inadequate assistance does not satisfy the Sixth Amendment right to counsel made applicable to the States through the Fourteenth Amendment.... [T]he Sixth Amendment does more than require the States to appoint counsel for indigent defendants. The right to counsel prevents the state from

over the constitutional significance of the facts of the case, and not over the facts themselves"); *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–1715, 64 L.Ed.2d 333 (1980) (state-court holding that lawyers for co-defendants did not engage in multiple representation is a mixed determination of law and fact entitled to no presumption of validity under § 2254(d)); and *Neil v. Biggers,* 409 U.S. 188, 193 n.3, 93 S.Ct. 375, 379, n.3, 34 L.Ed.2d 401 (1972) (clearly erroneous rule inapplicable in reviewing lower courts' determination that suggestive identification procedures offended constitutional guarantees of due process; "the dispute between the parties is not so much over the elemental facts as over the constitutional significance to be attached to them").

The controversy has also appeared with regard to appellate review of a federal district court's decision as to whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence adduced at a habeas corpus petitioner's state-court trial. *Compare Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (federal courts have duty to assess historic facts when called upon to apply constitutional standards to convictions obtained in state court; factfinder's role as weigher of evidence is preserved "through a legal conclusion" that all of the evidence is to be considered in the light most favorable to the prosecution in determining whether any rational trier of fact could have found guilt beyond a reasonable doubt); and *Holloway v. McElroy,* 632 F.2d 605, 640 n.54 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981) (constitutional sufficiency of evidence supporting state-court conviction is a question of law; whether district court applied erroneous standard was therefore irrele-

vant to court of appeals' review), *with Davis v. McAllister,* 631 F.2d 1256, 1262 (5th Cir. 1980) (finding "clearly erroneous" the district court's holding that the evidence supporting petitioner's conviction was constitutionally insufficient, citing *Brown v. Blackburn* and *Caraway v. Beto*). Insofar as *Davis* may perpetuate *Brown v. Blackburn*'s use of the clearly erroneous standard to review legal determinations or mixed determinations of fact and law, *Davis,* too, must be questioned.

10. "As a panel of this Court, we are without power to overrule a decision of another panel. That task falls solely to the full Court sitting en banc." *Ford v. United States,* 618 F.2d 357, 361 (5th Cir. 1980). Neither can one panel "disregard the precedent set by a prior panel, even though it conceives error in the precedent. Absent an overriding Supreme Court decision or a change in the statutory law, only the Court sitting en banc can do this." *Davis v. Estelle,* 529 F.2d 437, 441 (5th Cir. 1976). *See also Republic of Texas Corp. v. Board of Governors of the Federal Reserve System,* 649 F.2d 1026, 1045 n.35 (5th Cir. 1981); *Ellis v. Great Southwestern Corp.,* 646 F.2d 1099, 1109 (5th Cir. 1981); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1192–93 (5th Cir. 1981). Here, we cannot pay heed to one line of precedent without disregarding the other, and we lack the authority to overrule one line at the other's expense.

Nonetheless, our decision to make an independent determination as to whether Washington received effective assistance of counsel, which gives him the benefit of the less restrictive standard of review, should not be a controversial one, given our ultimate disposition of Washington's ineffective assistance claim below in part II–C of this opinion.

conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

■ In this circuit, the standard for constitutionally effective assistance of counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir. 1974) (quoting *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), *adhered to in pertinent part on rehearing en banc*, 289 F.2d 928 (5th Cir.), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961) (emphasis by *MacKenna* panel)).[11] "[T]he methodology for applying this standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based on the *totality* of circumstances in the entire record." *Washington v. Estelle*, 648 F.2d 276, 279 (5th Cir. 1981) (emphasis in original).[12] The standard does not vary in accordance with whether counsel was retained or appointed. *Cuyler*, 446 U.S. at 344–45, 100 S.Ct. at 1716.[13]

Our cases have recognized that whether counsel has rendered reasonably effective assistance cannot be determined solely by reference to his performance at trial. "Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper*, 575 F.2d 1147, 1149–50 (5th Cir. 1978) (affirming grant of habeas relief on grounds that attorney's failure to conduct adequate investigation, including failure to interview known witnesses, deprived defendant of viable defense that he might otherwise have asserted). "Since 'investigation and preparation are the keys to effective representation,' . . . counsel have a duty to interview potential witnesses and 'make an independent examination of the facts, circumstances, pleadings and laws involved.'" *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979) (per curiam).[14]

11. *Accord, United States v. Burroughs*, 650 F.2d 595, 598 (5th Cir. 1981); *Ogle v. Estelle*, 641 F.2d 1122, 1128 (5th Cir. 1981); *Hill v. Wainwright*, 617 F.2d 375, 380 (5th Cir. 1980); *Wilkerson v. United States*, 591 F.2d 1046, 1047 (5th Cir. 1979); *Franklin v. United States*, 589 F.2d 192, 194 (5th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2177, 60 L.Ed.2d 1055 (1979); *Jones v. Estelle*, 584 F.2d 687, 690 (5th Cir. 1979); *Carbo v. United States*, 581 F.2d 91, 92 (5th Cir. 1978); *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978).

12. *Accord, Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir. 1981); *United States v. Gray*, 565 F.2d 881, 887 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978).

13. *Accord, Torna v. Wainwright*, 649 F.2d 290, 291–92 (5th Cir. 1981); *Perez v. Wainwright*, 640 F.2d 596, 597–99 (5th Cir. 1981); *Kemp v. Leggett*, 635 F.2d 453, 455, (5th Cir. 1981); *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981); *Jones v. Estelle*, 632 F.2d 490, 491–92 (5th Cir. 1980), *cert. denied*, ── U.S. ──, 101 S.Ct. 1992, 68 L.Ed.2d 307 (1981).

These cases properly recognize that *Cuyler* implicitly overruled precedent in this circuit to the contrary, such as *Fitzgerald v. Estelle*, 505 F.2d 1334, 1337 (5th Cir. 1974) (en banc) ("[t]o find state involvement in retained counsel's conduct which is adjudged to be less than reasonably effective, yet not so grossly deficient as to render the proceedings fundamentally unfair, it must be shown that some state official connected with the criminal proceeding who could have remedied the conduct failed in his duty to accord justice to the accused"), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975). *But cf. Ogle v. Estelle*, 641 F.2d 1122, 1127–28 & n.4 (5th Cir. 1981); *United States v. Guerra*, 628 F.2d 410, 412–13 & n.1 (5th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981) (both recognizing in footnote the change *Cuyler* worked in Fifth Circuit law, but repeating *Fitzgerald*'s state involvement distinctions).

14. *See also Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981); *Davis v. Alabama*, 596 F.2d 1214, 1217 (5th Cir. 1979), *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); *Bell v. Georgia*, 554 F.2d 1360, 1361 (5th Cir. 1977); *Mason v. Balcom*, 531 F.2d 717, 724 (5th Cir. 1976); *Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972); *Pennington v. Beto*, 437 F.2d 1281, 1285 (5th Cir. 1971); *Chalk v. Beto*, 429 F.2d 225, 227 (5th Cir. 1970); *King v. Beto*, 429 F.2d 221, 224 (5th Cir. 1970), *cert. denied*, 401 U.S. 936, 99 S.Ct. 921, 28 L.Ed.2d 216 (1971); *Caraway v. Beto*, 421 F.2d 636, 637–38 (5th Cir. 1970).

■ This duty to investigate and prepare is, however, far from limitless, and not every breach thereof will mean that counsel has failed to render reasonably effective assistance. "[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). Condemning the inevitable and understandable tendencies to the contrary, our cases uniformly command that counsel's effectiveness may not be assessed through the finely ground lenses of 20/20 hindsight—and this command is especially compelling in reviewing claims of ineffective assistance that are grounded in allegations of inadequate investigation and preparation. "Reasonably effective assistance" must be judged from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question. Further, even when counsel's investigation and preparation are determined to have been seriously inadequate, there must be a showing that the habeas petitioner was to some degree prejudiced thereby—of which more later.[15]

■ *2. The standard for effective assistance of counsel in capital cases.*—Before proceeding further, we must touch briefly upon one of Washington's purely legal arguments. Washington contends on appeal that the Constitution demands "stricter scrutiny of the performance of an attorney whose client is sentenced to die." The only arguably direct support that he cites for this proposition is *Voyles v. Watkins*, 489 F.Supp. 901, 910 (N.D.Miss.1980), in which the district court held that "when the defendant has been convicted of a capital offense, courts must strictly scrutinize counsel's conduct." The *Voyles* court relied

chiefly[16] on the plurality opinion in *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977), which emphasized that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." This, however, has no direct correspondence to the constitutional standards for effective assistance of counsel. Insofar as *Voyles* indicates that the constitutional standards for effective assistance of counsel vary according to the severity of the punishment imposed upon the defendant, we must disagree.

Washington also relies upon cases such as *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in which the Supreme Court repeated its oft-stated observation that "there is a significant constitutional difference between the death penalty and lesser punishments," *id.* at 637, 100 S.Ct. at 2389, and further noted that

> [t]o insure that the death penalty is imposed on the basis of 'reason rather than caprice or emotion,' [the Court has] invalidated *procedural rules* that tended to diminish the reliability of the sentencing determination. *The same reasoning must apply to rules* that diminish the reliability of the guilt determination.

*Id.* at 638, 100 S.Ct. at 2390 (emphasis added).[17] These cases, however, are inapposite to Washington's argument. In the first place, they are not ineffective assistance cases. More fundamentally, however, these cases generally relate to *procedures* that may affect the degree of accuracy with which guilt and sentencing determinations are made. While it is true that an ineffective lawyer may inject a massive risk of inaccuracy into such determinations, that inaccuracy does not come about through a procedural flaw in the system of justice.

---

**15.** See notes 25–35 *infra* & accompanying text.

**16.** The *Voyles* court also cited *Smotherman v. Beto*, 276 F.Supp. 579, 586 (N.D.Tex.1967), in which the district court cited *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), as support for the proposition that capital cases require "that every effort be exerted by the court in scrutinizing counsel's conduct." This, however, indicates only that the court

was aware of the importance of its task; this language falls far short of announcing a differing standard for effectiveness of counsel in capital cases, and *Powell* would support no such proposition.

**17.** There are many other cases to the same effect. *See, e. g., Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976) (plurality opinion).

Other than the *Voyles* case, Washington has not cited, and our own research has not revealed, any case in which the legal standards for constitutionally adequate assistance of counsel have been held to vary according to the severity of the punishment imposed upon the defendant. We refuse to so hold today.[18]

This is not to say, however, that the severity of the sentence faced by a criminal defendant is not a fact to be considered in the overall determination of whether counsel has been constitutionally adequate in a given case. While neither in capital nor noncapital cases is a defendant entitled to perfect or error-free representation, the number, nature, and seriousness of the charges against the defendant are all part of the "totality of circumstances in the entire record" that must be considered in the effective assistance calculus, just as are the strength of the prosecution's case and the strength and complexity of the defendant's possible defenses. Nonetheless, while the facts that must be considered will differ in each and every case, the legal standards for constitutionally effective assistance of counsel are constant.

### C. The Assistance Rendered by Washington's Counsel

Washington does not contend that his trial counsel, Darrell Reeves, was not "reasonably likely to render ... reasonably effective assistance"; Reeves' education, experience, and expertise in criminal cases are unassailable.[19] Rather, Washington contends that Reeves did not *render* effective assistance *in this case.* As summarized in his brief, Washington contends that Reeves was ineffective in the following respects:

[1] Counsel failed before trial to interview ten of eleven named prosecution witnesses. He did not interview easily accessible witnesses who could and eventually did undercut [Washington's] alibi defense. [2] He did not investigate the apparent under-representation of blacks on the relevant jury panels, nor at trial did he object to the court's and prosecutor's systematic striking of *all* of the blacks who were on the panel. [3] He did not *voir dire* the remaining white jurors concerning possible racial prejudice toward a black man accused of killing a white man. [4] Additionally, counsel did *no* independent investigation of the aspects of petitioner's character and offense that were relevant to mitigation of sentence.

(Emphasis in original; enumeration added.) We address these arguments in sequence.

■ *1. Reeves' failure to interview witnesses.*—With respect to Reeves' asserted failure to interview the witnesses named in

---

**18.** Innumerable practical problems would be presented by such a holding. For example, since effective assistance is not judged by hindsight, the heightened standard would have to apply to all cases in which a capital offense was *charged,* regardless of whether the jury subsequently convicted the defendant of a noncapital offense or refused to impose the death penalty in a capital case. Recognition of a "sliding scale" for this constitutional standard would also suggest, for example, that a defendant charged with aggravated assault would be entitled to a more effective lawyer than one charged with simple assault or public intoxication. We decline to embark on such a treacherous path.

**19.** Indeed, Washington concedes in his brief that Reeves "did not lack either innate ability or experience." At the federal court hearing, 37-year-old Reeves testified that he had received his undergraduate education at the University of Virginia and his legal education at the University of Mississippi. He estimated that he had practiced law in Columbus for about 11 years; his practice included both civil and criminal litigation in both the state and federal courts. Although Columbus had no public defender program, Reeves testified that he had been one of two local attorneys who was regularly appointed to represent indigent defendants; he estimated that he had tried from 25 to 30 cases involving felony charges, in most of which he had been appointed counsel. In fact, Reeves had obtained a jury verdict of acquittal on armed robbery charges against Johnny Washington some 18–24 months prior to Washington's capital murder trial. (These charges, of course, were never mentioned at the latter trial). Finally, although neither Reeves, the district attorney, nor the state trial judge had tried a capital murder case under Mississippi's statutory bifurcation scheme prior to Washington's trial, the three of them met informally on a number of occasions "just going over procedure to be sure that we were doing it as best we could."

the prosecution's witness list, the numbers given in the above-quoted excerpt from Washington's brief are somewhat misleading. Five of those witnesses were police officers who had participated in the investigation of Woods' death; since local police officers had standing instructions not to talk to defense counsel except through the chief of detectives, Reeves' decision not to interview them in person can hardly be faulted. Further, Reeves determined through a telephone interview with Roy Thompson (the convenience store clerk who testified about the shooting at trial) that Thompson could not identify or describe the gunmen; given that Washington's alibi defense did not dispute the events of the hold-up, this telephonic interview was unquestionably adequate. Neither can Reeves be faulted for failing to interview the doctor who testified as to Woods' cause of death: again, the alibi defense did not deny the prosecution's version of the shooting, but merely denied that Washington was involved. Finally, although Reeves did not interview the FBI agent through whom the

prosecution introduced the hair samples linking Washington to clothing found near the scene of the crime, Reeves had studied the FBI crime lab report prior to trial and was prepared effectively to cross-examine the agent as to possible inaccuracies in this method of identification. Reeves' representation of Washington was not ineffective by virtue of his failure to interview these witnesses.[20]

Only slightly more troublesome is Reeves' failure to interview Washington's alleged accomplice, Booker Cole. At the habeas hearing, Reeves testified that he had talked to Cole's lawyer, who would not agree to let Reeves interview Cole. Nonetheless, Reeves had heard Cole's version of events at Washington's preliminary hearing; he was fully aware of the details of Cole's plea bargain; and he used Lucy Washington (who was Johnny Washington's sister and Cole's girlfriend) as "more or less a go-between" with Cole.[21] Washington argues that under Mississippi law,[22] he had an absolute right of access to Cole that Reeves should have asserted on his behalf. None-

---

**20.** Although we hold that under these circumstances, Reeves was not ineffective by virtue of his failure thoroughly to interview these witnesses prior to trial, we note too that Washington has in no way suggested—much less demonstrated—how his case was in any way prejudiced by Reeves' failure to interview these witnesses. This, too, would be fatal to his ineffective assistance claim with regard to these witnesses. See notes 25–35 *infra* & accompanying text.

**21.** In response to questioning from the district court, Reeves gave the following testimony at the habeas hearing:

> Q. Other than the, obtaining witnesses from Johnny Washington, did you get any witnesses from his mother or the members of the family?
> A. Lucy Washington was more or less a go-between [between] myself and Booker Cole. Booker was incarcerated and Lucy kept telling me that Booker was going to recant his confession. And we went into some of that on cross examination, but he had no intention of recanting.
> Q. Did you interview Booker Cole yourself?
> A. No.
> Q. Was he represented by separate counsel?
> A. He was.

> Q. Did you make an effort to interview him by permission of his counsel?
> A. I talked to his counsel. I am trying to remember now who the counsel was. I don't recall. But they had a plea bargain arrangement worked out so that Booker was going to plead guilty to robbery, not armed robbery, just simple robbery and get a ten year sentence and on that, that he would serve approximately three years. And *his attorney didn't want me anywhere near the case.*
> Q. Were you aware of the trade?
> A. Yes, sir.
> Q. Before trial?
> A. Yes, sir.

(Emphasis added.)

**22.** Both parties cite the Mississippi Supreme Court's holding in *Scott v. State*, 359 So.2d 1355, 1360 (Miss.1978), that "[a] defendant is entitled to access to prospective witnesses; however, this right exists co-equally with the right of a witness to refuse to say anything." We note, however, that Washington's trial took place more than one year prior to the *Scott* decision; as the Mississippi Supreme Court noted in that case, *id.* at 1359, that court had not previously decided whether a trial judge may compel a witness to submit to an interview by counsel. At best, then, Washington's right to compel an interview with Cole was unclear under Mississippi law.

theless, there would have been no guarantee that Cole would have cooperated had Reeves forced an interview over Cole's counsel's objections. In these circumstances, and without considering the fact that Cole's actual testimony at trial was entirely consistent with his testimony at the preliminary hearing,[23] we cannot agree that Reeves' representation was ineffective by virtue of his failure to interview Cole.

■ More serious is Reeves' failure to interview the two eye-witnesses (other than Cole) who linked Washington to the shooting: Curtis Cobb, who testified that he saw Cole and Washington retrieve a shotgun and money bag from some honeysuckle bushes near Cobb's house at about 1:00 a.m. following the shooting; and Ben Hodo, who testified that immediately after seeing one masked gunman running across the street from Woods Quick Pick, he saw Washington, unmasked and carrying a shotgun, in the alley behind the building. Washington contends that Reeves' failure to interview these two witnesses[24] was such

23. Cole's trial testimony may relate to the degree to which Washington's case was prejudiced, if at all, by Reeves' failure to insist that he be allowed to interview Cole prior to trial. It appears that Cole's testimony at trial was entirely consistent with his testimony at the preliminary hearing, at which he was the main witness. Other than suggesting that Reeves might have been able to persuade Cole to recant his confession and implication of Washington, Washington has not suggested that he was prejudiced in any manner by Reeves' failure to insist that he be allowed to interview Cole prior to trial.

Since we must not gauge the effectiveness of counsel by hindsight, however, prejudice is a distinct inquiry from the initial question as to whether Reeves' failure to insist upon interviewing Cole made his representation of Washington ineffective, given the surrounding circumstances and the information available to Reeves prior to trial. Accordingly, we decline to speculate as to whether Reeves might have been able to persuade Cole to recant.

24. In response to questioning by Washington's habeas counsel, Reeves gave the following testimony at the habeas hearing with respect to his failure to interview Cobb:

Q. ... Did you interview a witness Cobb prior to trial?
A. No.
Q. Curtis Cobb?
A. No.
Q. Did you make any attempt to?
A. I talked to Johnny Washington about Curtis Cobb.
Q. But you didn't attempt to talk with Curtis Cobb?
A. No.

Also in response to questioning by Washington's habeas counsel, Reeves gave the following testimony at the habeas hearing with respect to his failure to interview Hodo:

Q. What effort did you make to find out about this witness Hodo and who he was and what his testimony was going to be? Did you attempt to find his grandmother?
A. I asked. Nobody knew. They knew she was in Columbus, but they didn't know where she was. *I didn't really think he was going to be much of a witness based on what they could tell me about him.* They knew his grandmother. He was a, lived in Alabama and he came over and stayed with his grandmother on occasion. But they couldn't tell me where his grandmother lived.
Q. Okay. But you didn't attempt to find out where he was from or where he lived from the District Attorney?
A. I had an address of sorts. Just a minute, it is on here. Route 1, Box 150, Millport.
Q. Okay. Did you attempt to go out there and find out who he was.
A. No.
Q. All right. Had you known what his testimony was going to be prior to trial, would you have filed any motions to deal with his testimony, such as motions to quash the identification?
A. I would have investigated it. I might have.

(Emphasis added.) Later in the hearing, in response to questioning by counsel from the State, Reeves gave the following testimony with respect to Hodo:

Q. [Washington now alleges] you had failed to establish tainted eye witness testimony. You do recall Hodo's testimony at trial?
A. Yes.
Q. You did not interview Ben Hodo prior to trial?
A. No.
Q. You stated you had an address of Hodo?
A. Rural address.
Q. What document did you read that address from and where did you receive that?
A. From a letter from Thad Buck, who was the [State's] investigator.
Q. In other words, the State released that to you?
A. Yes, on the 13th of May, '77.

The district court found as a matter of basic, historical fact that "[n]either [Washington] nor the other members of his family were aware that Hodo was an eyewitness; Reeves, having been furnished with the wrong address, was unsuccessful in locating Hodo prior to trial." In keeping with our assumption above that

a serious mistake as to have rendered his assistance ineffective, and that as a result of this failure, Reeves was unprepared to seek the suppression of Cobb's and Hodo's eye-witness identifications on grounds of undue suggestiveness.

We assume for purposes of argument that Washington is correct in this contention—that is, that given all of the circumstances and the information available to Reeves before the trial, and given the strength of the prosecution's case and the nature of the defense Washington had chosen to pursue, Reeves' failure to interview these two prosecution witnesses despite knowing their names and addresses was a clear and grievous breach of his duties as a defense lawyer. Nonetheless, it is clear beyond peradventure that Washington's rights were in no measure prejudiced by that breach of duty.

There is no doubt but that Hodo's eyewitness identification of Washington was extremely "prejudicial" in the sense that it hurt Washington's case;[25] the same is true, albeit to a lesser degree, of Cobb's testimony.[26] But this is not the sort of prejudice of which a defendant justly may complain. Rather, he may justly complain only of undue and unfair prejudice—that is, that the harm done to his case would not have come about had his constitutional rights been strictly protected.

[11] Washington has suggested only one way[27] in which his trial might have been

Reeves committed a serious breach of his duty to investigate in failing to interview Hodo, we will accept for purposes of argument Washington's contention that the court was clearly erroneous in finding that Reeves had been given an incorrect address.

25. In response to questioning by counsel for the State at the habeas hearing, Reeves described Hodo's trial testimony as follows:

Q. Will you describe the appearance and demeanor of this witness at trial?

A. He was very good. He was clean cut, had just graduated from high school and, my recollection, was about to enter the air force. I did not see that in the record, but somewhere I have a notion he was about to enlist in the air force. But he was articulate and very definite in what he had to say. He was a good witness for the prosecution.

Q. Were you aware prior to trial this witness had viewed photographs?

A. No.

Q. When was this first brought to light?

A. During the course of cross examination, I believe.

Q. Did you make any attempt to determine whether or not the in-court identification was based on what he saw in the photographs or based on what he saw on the night of the crime?

A. I did. And his testimony was what he saw on the night of the crime.

Q. Were there any reasons for you to, for your declination to further pursue this issue of the in-court identification?

A. No. *Actually I wanted to get him out of the courtroom as quick as I could.*

Q. For what reason?

A. *Because he was too good a witness for the State.*

(Emphasis added.)

26. Cobb testified that he was standing in his back yard, looking for a set of lost keys, when he saw Cole and Washington walk by, search through some nearby honeysuckle bushes, and emerge carrying a shotgun and a money bag. This, of course, directly contradicted Washington's account of his whereabouts at 1:00 a. m. in the morning following the shooting, although it only circumstantially linked Washington to the crime.

Cobb testified that although he had been to a lounge earlier that evening, he had not had anything to drink, since he was on his college track team. He testified that although it was dark where he was standing, he could see Cole and Washington very clearly by the light of a streetlight, and that he had recognized Washington and had had a chance to look him over very thoroughly. Cobb denied having seen Washington since that time, and denied that the police had asked him to pick Washington out of a series of photographs.

Reeves developed through other witnesses, however, that Cobb had initially identified Johnny Washington's brother, R.L. Washington, as the man he had seen searching through the bushes with Cole; indeed, the police initially arrested R.L. Washington on the basis of Cobb's misidentification. Reeves stressed this misidentification to the jury in his closing argument in an attempt to impeach Cobb's testimony.

27. In what is essentially a derivative argument, Washington also suggests that because Reeves was surprised by the nature of Cobb's and Hodo's testimony, he was unprepared to probe their testimony through vigorous cross-examination for fear that he might unearth something worse. In fact, Reeves' cross-examination of both of these witnesses appears to have been quite skillful.

The short answer to Washington's argument, however, is that he has failed utterly even to

different had Reeves interviewed Hodo and Cobb: he suggests that Reeves would have filed a pretrial motion to suppress Hodo's and Cobb's in-court identifications on grounds that they were unduly suggestive under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).[28] After examining the record,[29] however, we are satisfied that Washington has failed to establish that such a suppression motion would properly have been granted had it been made: under the totality of the circumstances, as developed by Reeves' cross-examination of Cobb[30] and Hodo[31] at trial,

allege—much less establish—that there was anything more for Reeves to establish through cross-examination. There simply does not seem to be anything more that Reeves could have done to discredit these witnesses' testimony. Particularly with respect to Hodo, Reeves can hardly be faulted for "wanting to get him out of the courtroom as quick as [he] could," for Hodo was indeed "too good a witness for the State."

**28.** *Manson* reemphasized that the factors which were first stated in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), are to be considered in determining whether under the "totality of the circumstances" an identification can be deemed sufficiently reliable to be admissible. 432 U.S. at 107 & n.9, 97 S.Ct. at 2249 & n.9. *Biggers* emphasized "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the trial and the confrontation." 409 U.S. at 199, 93 S.Ct. at 382.

"The *Biggers* components govern the admissibility of both in-court and out-of-court identification[s]." *United States v. Bazan*, 637 F.2d 363, 366 n.8 (5th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981). *See generally id.* at 365–67; *Meyer v. Estelle*, 621 F.2d 769, 774–75 (5th Cir. 1980); *Babers v. Estelle*, 616 F.2d 178, 180–81 (5th Cir.), *cert. denied*, 449 U.S. 985, 101 S.Ct. 404, 66 L.Ed.2d 248 (1980).

**29.** Washington presumably could have called Cobb, Hodo, or both as witnesses at the habeas hearing in order to amplify upon the circumstances surrounding their identifications of Washington. He did not do so. As a result, virtually the only evidence about these identifications is that which Reeves developed through cross-examination at Washington's trial.

**30.** The only respects in which Washington challenges Cobb's identification of him have to do with the facts that Cobb was returning from a bar when he allegedly saw Cole and Washington; that it was dark; and that Cobb originally misidentified R.L. Washington, Johnny Washington's brother, as the man he had seen with Cole. Cobb's uncontradicted testimony at trial, however, established that there was adequate light and that Cobb had not been drinking. See note 26 *supra*.

We assume *arguendo* that there was something impermissibly suggestive in Cobb's confrontation with Washington that might have tainted his in-court identification, and that Washington therefore has met the first of this circuit's two requirements, *see e. g.*, *Preacher v. Estelle*, 626 F.2d 1222, 1223 & n.3 (5th Cir. 1980), *cert. denied*, 450 U.S. 930, 101 S.Ct. 1389, 67 L.Ed.2d 362 (1981), for suppressing an in-court identification. However, Washington has not met the second requirement by demonstrating that under the totality of the circumstances, a very substantial likelihood of misidentification existed *at the trial*. Only one of the *Biggers* factors—"the accuracy of the witness' prior description of the criminal"—cuts in favor of suppression. Based on Cobb's trial testimony all three of the other factors cut against suppression, and Washington has failed to supplement the trial record with any evidence to the contrary.

Therefore, we must conclude that Cobb's in-court identification of Washington, though perhaps rendered somewhat questionable by virtue of the prior misidentification, was merely part of the "customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable value." *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254. As we observed above in note 26, Reeves competently brought to the jury's attention the respects in which Cobb's testimony was suspect.

**31.** Hodo testified on direct examination that he had seen Washington at a distance of seven feet. On cross-examination by Reeves, Hodo described in more detail the circumstances under which he had seen Washington:

Q. How long did you look at him?
A. About ten seconds.
Q. About ten seconds?
A. Yes sir.
Q. Now what was he doing?
A. He was walking.
Q. He was walking?
A. He was running at first, and then he stopped. See, I saw him, you know, at the alley. It is a fence. I saw him running at first. And I got on in the middle of the alley. He stopped.
Q. And there was a light in there?
A. Yes sir.
Q. How long did you look at him?
A. About ten seconds.
Q. What did he have in his hand?
A. A gun.
Q. What did he have on?

we cannot conclude that there existed at trial the "very substantial likelihood of irreparable misidentification," *id.* at 116, 97 S.Ct. at 2254, necessary before an in-court identification need be suppressed.

The law of our circuit is as yet unclear as to the precise *degree* of prejudice that a defendant must demonstrate before he is entitled to habeas corpus relief on grounds that he received ineffective assistance of counsel, although it is clear that *some* degree of prejudice must be shown.[32] We need not decide what degree of prejudice is necessary, however, for Washington has failed to demonstrate that *any* prejudice whatsoever accrued from Reeves' failure to

A. I don't remember what he had on.
. . . .
Q. You can without question point out this man as being the man you saw for approximately ten seconds, if not in a completely dark, a darkish alley and that was a month ago?
A. Yes.
Q. You are positive?
A. I am positive.

In later questioning, Reeves established that Hodo had picked Washington out of an array of six or eight photographs in early April and again on the morning before trial. Reeves tried to get Hodo to admit that he had been influenced by the arrays:

Q. Let me ask you this: could looking at those photographs enable, having picked Johnny Washington twice in those photographs, are you identifying him now by reference to those photographs or by what you saw in the alley?
A. What I saw in the alley.
Q. You are positive?
A. Yes.

At this point, Reeves concluded his cross-examination.

There is no suggestion from this record that the photographic arrays were unduly suggestive in the least. But even assuming that there was some impermissible suggestiveness inherent in the photo arrays, or in the circumstances surrounding the in-court identification, Hodo's uncontradicted testimony established his opportunity to view, his degree of attention, the accuracy of his description, the level of his certainty, and the relatively brief time between the crime and the initial confrontation. There is no question but that under the totality of the circumstances, there was not such a very substantial likelihood of misidentification as to render Hodo's in-court identification inadmissible.

32. Cases indicating that some degree of prejudice must be shown include *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981) (indicating that on remand petitioner would need to show how expert psychiatric assistance would have helped petitioners' case had counsel obtained it for trial); *Mendiola v. Estelle*, 635 F.2d 487, 491 (5th Cir. 1981) (denying relief in part because petitioner could show no prejudice from his appellate counsel's failure to raise certain grounds on appeal because petitioner himself had raised those grounds in a pro se brief); *Lovett v. Florida*, 627 F.2d 706, 709–10 (5th Cir. 1980) (denying relief on ineffective assistance claim when petitioner contended, without any substantiation, that had counsel arranged for handwriting analyses, they would have been exculpatory); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (denying relief on ineffective assistance claim that was predicated on counsel's failure to call witness when petitioner failed even to allege how witness' testimony would have been helpful); *United States v. Doran*, 564 F.2d 1176, 1177–78 (5th Cir. 1977) (denying relief on ineffective assistance claim that was predicated on counsel's failure to locate and subpoena two witnesses because "[t]here has been no affirmative demonstration of prejudice"), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); and *Pennington v. Beto*, 437 F.2d 1281, 1285 (5th Cir. 1971) (indicating that on remand, petitioner would need to establish both that uncalled witnesses were available to counsel and that their testimony would have been helpful to petitioner's case). *Accord, Cooper v. Fitzharris*, 586 F.2d 1325, 1331–33 (9th Cir. 1978) (en banc) (when an ineffective assistance claim is premised on specific acts or omissions of counsel, the allegations must be buttressed by a showing of injury or prejudice to the defendant), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). *Cf. Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972) (per curiam) (noting that since uncalled witnesses had testified at habeas hearing that they would have corroborated petitioner's alibi defense, petitioner had demonstrated prejudice from counsel's failure to investigate).

How much prejudice need be demonstrated appears to be as yet an open question. *Compare Davis v. Alabama*, 596 F.2d 1214, 1221–23 (5th Cir. 1979) (suggesting that "[n]ot every defendant whose attorney was deficient must show prejudice," but if so, a defendant "need only show that his attorneys' errors were not 'harmless beyond a reasonable doubt,'" citing *Chapman*, *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); and *United States v. Decoster*, 624 F.2d 196, 290–95 (D.C. Cir. 1979) (en banc) (Bazelon, J., dissenting, joined by Wright, C.J.) (once petitioner has established his trial counsel's ineffectiveness, burden is on government to establish that error was harmless beyond a reasonable doubt), *with id.* at 208 & n.74 (plurality opinion of Leventhal, J., joined by three judges) ("the accused

interview Hodo and Cobb prior to Washington's trial: given that Reeves would not have been able to suppress the in-court identifications of Washington even had he interviewed them prior to trial, we perceive no way in which Washington's trial would have differed had Reeves conducted such interviews.

■ Washington also contends that Reeves "did not interview easily accessible witnesses [other than those listed on the prosecution's witness list] who could and eventually did undercut [Washington's] alibi defense." With respect to Reeves' failure to interview additional people who attended the party at which Washington claimed to have been at the time of the shooting,[33] the short answer to this argument is that Washington has utterly failed to demonstrate that any of the party-goers other than the witnesses Reeves *did* call would have supported Washington's alibi. Our comments in *United States v. Guerra,* 628 F.2d 410, 413 (5th Cir. 1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981), are apposite here:

> Complaints concerning uncalled witnesses [require] a heavy showing [by the petitioner] since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative.... None of the alleged witnesses were called at the [federal habeas cor-

---

must bear the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome of the trial"; thereafter, "the conviction cannot survive unless the government demonstrates that it is not tainted by the deficiency, and that in fact no prejudice resulted"; if showing by the accused causes the court serious misgivings notwithstanding the absence of a constitutional violation, government may prevail upon showing short of *Chapman* standard); and *id.* at 232 (MacKinnon, J., concurring, joined by two other judges) ("a defendant must show substantial unfair prejudice to his defense resulting from a substantial violation of duty owed him by his counsel," at which point the burden shifts to the government to rebut this showing).

We note, too, that numerous courts have held that no prejudice need be shown in those few instances in which an ineffective assistance claim is premised not on specific acts or omissions of counsel, but instead on the fact that "no counsel [was] provided, or counsel [was] prevented from discharging his normal functions." *E. g., Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir. 1979). *Cf. Torna v. Wainwright,* 649 F.2d 290, 292 (5th Cir. 1981); *Perez v. Wainwright,* 640 F.2d 596, 598–99 (5th Cir. 1981) (both holding that when a defendant is denied an opportunity timely to appeal because of his counsel's failure to "perform his promise that an appeal would be taken, fairness requires that the deceived defendant be granted an out-of-time appeal"; since counsel's ineffectiveness wholly deprived the defendant of an appeal, the defendant need make no showing that an issue of arguable merit will be raised in the out-of-time appeal). The case at bar clearly does not present such a claim.

*Nelson v. Estelle,* 642 F.2d 903, 905 n.3 (5th Cir. 1981), expressly declined to decide whether a petitioner must demonstrate prejudice to prevail on an ineffective assistance of counsel claim. In that case, the alleged ineffectiveness stemmed from counsel's failure to object at trial to clearly inadmissible hearsay evidence. The *Nelson* court noted that erroneous evidentiary rulings by state courts may be grounds for federal habeas corpus relief only if the erroneously admitted evidence sapped the trial of fundamental fairness—*i. e.,* only if the error was " 'material in the sense of a crucial, critical, highly significant factor.' " *Id.* at 907–08 (quoting *Hills v. Henderson,* 529 F.2d 397, 401 (5th Cir.), *cert. denied,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976); *accord, Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir. 1981)). Significantly, there was no showing in that case that the erroneously admitted hearsay was inaccurate or otherwise unreliable; thus, even though the petitioner had been "prejudiced" by the hearsay in the sense that its admission was detrimental to his case, that prejudice was not undue or unfair.

Accordingly, the *Nelson* court determined that the erroneously admitted evidence did not drain the state-court proceedings of fundamental fairness, 642 F.2d at 907–08, and declined to afford the petitioner greater protection through an ineffective assistance claim than that to which he would have been entitled had he challenged the admission of the hearsay directly. As an alternate ground for its holding, the *Nelson* court noted that it was not until two months after the petitioner's trial that the Texas Court of Criminal Appeals had held inadmissible the hearsay to which the petitioner claimed his counsel should have objected; the court repeated our familiar observation that "[c]lairvoyance is not a required attribute of effective representation." *Id.* at 908 (quoting *Cooks v. Wainwright,* 461 F.2d 530, 532 (5th Cir. 1972)).

**33.** Specifically, Washington alleges that Reeves failed to interview party-goers identified as Spencer Cotton, Glenda Cotton, Charles Huggins, and "a girl called Tittie Boo."

pus] hearing and no one knows what they would have testified to. All we have is what [the petitioner] says they would have said.

Again, on this record, any inadequacy in Reeves' representation that is attributable to his failure to interview nontestifying party-goers must be deemed completely nonprejudicial to Washington, given his utter failure to establish at his federal habeas hearing that the nontestifying party-goers would have corroborated Washington's alibi defense.

This is also true with respect to those persons who contradicted Washington's alibi story, either as prosecution witnesses or as defense witnesses whose testimony surprised Reeves: there has been absolutely no showing that Reeves' failure to interview some of these witnesses,[34] or his failure to interview others of them more thoroughly,[35] in any way prejudiced Washington's defense, despite Washington's clear opportunity to make such a showing at his federal habeas hearing.

Accordingly, we must reject Washington's contention that he should be granted federal habeas corpus relief on grounds that his counsel was constitutionally ineffective by virtue of his failure adequately to interview prospective and actual witnesses.

2. *Reeves other asserted failings.*— Washington contends that Reeves' assistance was constitutionally ineffective by virtue of his failure to investigate the apparent under-representation of blacks on the relevant jury panels, and by his failure to object to the court's and the prosecutor's systematic striking of all of the blacks who were on the panel. On this record, we harbor considerable doubt as to whether such challenges would properly have been sustained even had Reeves chosen to make them. However, while Reeves testified at the habeas hearing that he had considered arguing that blacks had been systematically excluded from the petit jury venire, he chose not to pursue this argument as a matter of trial strategy.[36] Given all of the circumstances of this case, we cannot conclude that such a strategy was so ill-chosen that it made Reeves' overall representation constitutionally ineffective. Further, Reeves did object, without success, to the court's striking of black jurors who were excused for cause on grounds that they could not set aside their "sympathy." Reeves also testified that given his understanding of the law and of the facts of Washington's case, he saw no basis for a challenge to the prosecution's exercising its peremptory strikes against blacks.[37] We

---

34. Specifically, Washington alleges that Reeves failed to interview the following persons who were presented by the prosecution as rebuttal witnesses: James Albert Jones, who testified that "everybody that was at the party was in the living room" and that he never saw Washington there; Flora Toney, who lived in the apartment where the party was given and testified that she never saw Washington at the party during the time of the robbery; and Henry Moore, who testified that he was at the party the whole night but that he had not seen Washington there.

35. Specifically, Washington urges that Reeves should have more thoroughly interviewed witnesses Leroy Hill and Douglas Harrison, whose surprise testimony tended to undercut Washington's alibi defense.

36. In response to questioning from Washington's counsel at the habeas hearing, Reeves testified as follows:

Q. ... Did you investigate the jury venire to determine whether or not there was a systematic exclusion of black citizens from the jury?

A. I did not.
Q. Could you tell me why you did not?
A. Several reasons. One, I had observed the jurors at that time for about eight years. I was personally familiar with a prior case that was, I believe, around 1975 involving black defendants charged with an attack on a white girl. The venires there were challenged. After investigation by the attorneys, ... [they] withdrew their motion.

Based on that, based on observing the number of blacks that are on juries, based on the fact that there were many competent attorneys that practice in Columbus court, none had ever made that challenge, and *I felt it was totally without merit.*
(Emphasis added.)

37. In response to questioning from Washington's counsel at the habeas hearing, Reeves testified as follows:

Q. Now in your experience, in your observations in cases that you have tried *prior to the Washington case and after the Washington case,* has it been your experience that the District Attorney has in cases where the

cannot conclude that Reeves' representation was inadequate in these regards.

■ Neither do we find merit in Washington's claim that Reeves' representation was inadequate because he failed during voir dire examination to prove the venire members' racial attitudes. Reeves' testimony at the habeas hearing indicates that he made a conscious tactical decision not to expand on the trial court's and prosecutor's general questioning of the jury regarding their fairness and impartiality.[38] On this

client has been black, the defendant has been black has used peremptory challenges to strike black jurors?

A. Now I could only speak as to cases that I have tried.

Q. That is all I am asking.

A. *Sometimes he does and sometimes he doesn't.*

Q. Would you say that is more of a pattern that he does or he doesn't? I believe we discussed this yesterday to some degree.

A. To some degree. In a case of this nature, I think it would be his pattern to strike blacks as in my position I would be wanting to strike the whites.

(Emphasis added.) Later in the hearing, Reeves amplified upon this testimony:

Q. ... Now you earlier testified that the District Attorney, I believe, used out of twelve peremptory strikes ten strikes and those were blacks. Now the other two, if I am not mistaken, one was a woman who voiced some objection to being able to give the death penalty, is that correct?

A. That is correct.

Q. And the other one was a minister?

A. A minister who also employed Johnny Washington's mother in the church.

Q. I see. And the judge didn't rule for cause on that one?

A. Not for cause.

Q. Did it occur to you to object to the District Attorney's striking black jurors as a matter of practice and tactics as you mentioned earlier?

A. No. As far as I understand the law, he has got twelve he can use for any reason. He is picking a jury that he hopes will convict.

Q. Okay. So your understanding of the law is then that if the District Attorney wishes to base his peremptory challenges totally on racial background?

A. Now, I am not looking into his mind because I don't know.

Q. I am asking your understanding of the law, that he can use or she can use those peremptory challenges for any reason that they desire as a trial tactic?

A. Yes. He can strike, he has that twelve that he can strike without giving a reason.

Q. Even if that reason is just purely race, he or she could still strike for that reason?

A. Well, now I don't want to get back into that circle. It is my understanding that he can strike twelve for whatever reason he desires, without giving a reason.

Reeves was certainly correct in his understanding that a prosecutor generally need not

justify his use of peremptory strikes. Washington cites *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), for the proposition that a defendant's constitutional rights may be infringed by a prosecutor's deliberate and continued exclusion of blacks from juries through the use of peremptory challenges. "But a defendant bears a heavy burden when he seeks to show systematic discrimination of constitutionally significant proportions. It is not enough to base such a constitutional claim on the facts of the single case presented to this court." *Easter v. Estelle*, 609 F.2d 756, 759 (5th Cir. 1980). It can hardly be contended that Reeves general, equivocal comments about the district attorney's "pattern" of striking blacks is sufficient to establish that there has in fact been systematic exclusion of blacks from juries; indeed, Reeves' statement that "sometimes [the prosecutor] does [strike blacks] and sometimes he doesn't" would completely undercut such an argument.

Further, Reeves' observations about the district attorney's "pattern" were based on his experience both before and after Washington's trial; the record indicates, however, that Washington's was the first case Reeves had tried against this district attorney, who had been elected to the position only a short time before. There is no evidence in the record that would tend to establish that any other prosecutor in Columbus participated in such a "pattern" of systematic exclusion of blacks. Given that we must not evaluate counsel's effectiveness using hindsight, it is difficult in these circumstances to conceive how Reeves could be expected to have objected at Washington's trial to this prosecutor's "pattern" of striking blacks, if indeed such a pattern developed after Washington's trial.

**38.** In response to questioning from Washington's counsel at the habeas hearing, Reeves testified as follows:

Q. [M]y reading of the record indicates that there were no questions asked either by the judge, by the defense, or by the prosecution other than a general question of whether you could be fair and impartial regarding, specifically regarding prejudice against black people.

A. I would say one thing, if a person does feel that prejudice, he is not going to stand up and admit it. But when you ask him if he could give an impartial trial, he is either going to say yes or he is going to say no.

record, there is no reason to conclude that this strategy was ill-chosen; Reeves' representation was not inadequate in this respect.

 Washington also alleges that had Reeves spent more time consulting with him, Washington would have chosen not to pursue the alibi defense. Washington has failed, however, to suggest any viable defense that he might have pursued in its place,[39] and Reeves' efforts to strike a plea bargain with the prosecution were rebuffed. Reeves' testimony indicates that he conferred with Washington on five or six occasions prior to trial, and that they discussed the nature of the alibi defense in detail. We cannot conclude that Reeves failed adequately to consult with his client.

The final respect in which Washington contends that Reeves' representation was inadequate relates to his alleged failure adequately to prepare for the sentencing phase of Washington's trial. We need not reach this argument, however, because we conclude below in part III of this opinion that an error of constitutional dimensions in the sentencing phase of Washington's trial precludes the imposition of the death penalty. Reeves' alleged ineffectiveness in the sentencing phase of Washington's trial could not have infected the earlier determination as to Washington's guilt or innocence.

*3. Our conclusions as to Washington's ineffective assistance of counsel claim.*—In parts II–C–1 and II–C–2 of this opinion, *supra,* we have examined in some detail the specific respects in which Washington contends that his trial counsel provided constitutionally ineffective assistance. In each instance, we have concluded either that Reeves' actions were correct, or that they reflected conscious defense strategies that were not so ill-advised as to justify a con-

---

Q. And specifically, if a person was asked whether or not they held any animosity or had any specific prejudices against blacks you didn't feel that was—
A. No.
Q. —that was important to ask. All right.

This clearly demonstrates that Reeves' decision not to pursue further the issue of racial prejudice was a considered tactical choice.

**39.** Washington suggests that the prosecution's evidence—specifically, Roy Thompson's testimony that Woods repeatedly grabbed at the gunman's gun and followed him to the door—suggested a "provocation/accidental shooting" defense. This suggestion, however, ignores the fact that the statute under which Washington was convicted defines the killing of another human being as capital murder "[w]hen done *with or without any design to effect death,* by any person engaged in the commission of the crime of . . . robbery." Miss.Code Ann. § 97–3–19 (1980 Supp.) (emphasis added). The Mississippi Supreme Court's interpretation of this provision confirms that the defendant's specific intent to kill is irrelevant under this felony murder provision. *Culberson v. State,* 379 So.2d 499, 507–08 (Miss.1979) (en banc), *cert. denied,* —— U.S. ——, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980); *Gray v. State,* 351 So.2d 1342, 1344–45 (Miss.1977) (en banc). Thus, any suggestion that Washington might profitably have urged that his shooting of Woods was excusable on provocation or self-defense grounds is frivolous. Further, as a general matter, "[a]ccident is, of course, no defense to a homicide committed in the perpetration of, or in the

attempt to perpetrate, a felony." 40 Am.Jur.2d *Homicide* § 112, at 407 (1968). *See also* W. LaFave & A. Scott, Handbook on Criminal Law § 71, at 549–50 (1972). In short, under hornbook criminal law, these suggested "defenses" are inapplicable when the crime charged is felony murder.

In a separate argument, Washington contends that the Eighth and Fourteenth Amendments forbid imposition of the death penalty in the absence of a finding that Washington deliberately, purposely, or intentionally acted to take a human life, relying chiefly on Justice White's opinion in *Lockett v. Ohio,* 438 U.S. 586, 624–28, 98 S.Ct. 2954, 2983–85, 57 L.Ed.2d 973 (White, J., concurring in part and in the judgment, and dissenting in part). *See generally* Comment, *The Constitutionality of Imposing the Death Penalty for Felony Murder,* 15 Hous. L.Rev. 356 (1978). Given our holding below in part III–E of this opinion, we expressly decline to address this argument. We note, however, that this contention would relate only to the imposition of the death penalty—not to Washington's guilt or innocence—and at best could have left him facing a mandatory life sentence with no possibility of parole, *see* Miss.Code Ann. § 99–19–107 (1980 Supp.). Hence, it can hardly be argued that Reeves should have abandoned the alibi defense that was preferred by his client in favor of a constitutional argument that thus far has been accepted by only one of the Court's nine Justices, and that at best would have left his client in prison for life without possibility of parole.

clusion that Reeves' assistance was made inadequate thereby, or that they were completely nonprejudicial to Washington's case.

Yet we cannot emphasize too strongly that while this step-by-step method of analysis is, as an initial matter, necessary in order properly to evaluate an ineffective assistance of counsel claim, what is ultimately important is trial counsel's performance on balance and in the context of the entire case. Our repeated assertions that a criminal defendant is not entitled to perfect or error-free counsel are not mere rhetoric. Given our analysis of each of the respects in which Washington contends that Reeves' representation was ineffective, the task of balancing the positive aspects of Reeves' representation against his shortcomings is easy to perform in this case: since in no single respect was his representation both inadequate and prejudicial to Washington's defense, there is no question but that on balance and in the context of the entire case, his representation of Washington was constitutionally adequate. Further, that the foregoing analysis of Reeves' effectiveness has concentrated solely on his alleged inadequacies should not obscure the fact that in many respects upon which we have not dwelt, his representation of Washington was far more than adequate.

III. THE LIMITATION ON THE JURY'S CONSIDERATION OF MITIGATING FACTORS IN THE SENTENCING PHASE OF WASHINGTON'S TRIAL

A. *The Trial Court's Charge on Aggravating and Mitigating Factors*

In the sentencing phase of Washington's trial, which followed immediately after the jury found Washington guilty of capital murder, counsel for the State presented evidence in aggravation and counsel for Washington presented evidence in mitigation. The trial court then, without objection from either side, instructed the jury in pertinent part as follows:

Members of the jury, as the court explained to you in the beginning of the trial, you have heard some evidence in aggravation put on by the State and you have heard evidence in mitigation put on by the defendant. You must in your sentencing find at least one item present of aggravation before you could impose the death penalty. If you find an item in aggravation present beyond a reasonable doubt, then you must consider any evidence in mitigation. And unless the evidence in mitigation could overcome the aggravation, of course, then you could return the death penalty....

. . . .

You have found the defendant guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or to life imprisonment. In reaching your decision you must obviously consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself. To return the death penalty you must find that the aggravating circumstances, those which tend to warrant the death penalty, outweigh the mitigating circumstances, which are those which tend to warrant the lesser [*sic*] severe penalty. *Now consider only the following elements of aggravation in determining whether the death penalty should be imposed*: One, the capital murder was committed while the defendant Johnny Lewis Washington was engaged in the commission of the crime of robbery. Two, the defendant Johnny Lewis Washington committed this capital murder in an especially heinous, atrocious, or cruel manner. Those are your elements of aggravation.

You must unanimously find beyond a reasonable doubt that one or more of these existed in order to return the death penalty.... Now if one or more of those elements of aggravation is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances. *Now consider the following elements of mitigation in determining whether the death penalty should not be imposed*: One, that the defendant has no significant history of prior criminal activity and two, the defendant's age at the time of the capital murder.

If you unanimously find from the testimony that *one or more of the preceding elements of mitigation* exist[s], then you must consider whether *it* outweighs the aggravating circumstances you previously found and you must return one of the following verdicts. . . .

(Emphasis added.) Washington argues that when taken as a whole, this charge operated to preclude the jury from considering as mitigating factors any of the circumstances surrounding his offense, and any aspects of his character and record other than his age and lack of a significant history of prior criminal activity. Washington contends that jury instructions which have this effect are impermissible under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

*B. Washington's Trial Counsel's Failure to Object to the Challenged Instruction*

In its first responding argument, the State contends that because Washington's trial counsel expressly declined to voice an objection to this jury instruction, Washington's *Lockett* argument must be treated as having been waived under Mississippi's contemporaneous objection rule.[40] According to the State, this rule constitutes an independent and adequate state procedural ground that, under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), bars our consideration on federal habeas corpus of Washington's *Lockett* claim.

■ We find two flaws in the State's *Sykes* argument. First, the State did not contend in the district court that Washington's *Lockett* claim is barred by Mississippi's contemporaneous objection rule and *Sykes*. As such, the State itself is preclud-

ed from raising at this late date any claim that Washington should be barred under a state-law theory of procedural default, for "[a]s a general principle of appellate review, this court will not consider a legal issue or theory that was not presented to the [federal district court]." *Noritake v. M/V Hellenic Champion*, 627 F.2d 724, 732 (5th Cir. 1980). *See, e. g., Smith v. Estelle*, 602 F.2d 694, 708 n.19 (5th Cir. 1979) (State waived its *Sykes* argument by failing to raise it in the federal habeas hearing prior to its motion for a new trial), *aff'd*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *LaRoche v. Wainwright*, 599 F.2d 722, 724 (5th Cir. 1979) (State waived its *Sykes* argument by failing to raise it in habeas proceedings in federal district court).

■ The second and more fundamental flaw with the State's *Sykes* argument lies in the fact that the Mississippi Supreme Court expressly addressed the merits of Washington's *Lockett* claim in his direct appeal, rather than applying a contemporaneous objection rule to bar consideration of the merits. *See* 361 So.2d at 67–68. "[I]f neither the state legislature nor the state courts indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *County Court of Ulster County v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) (footnote omitted). Accordingly, the *Sykes* rule is inapplicable to Washington's *Lockett* claim despite his trial counsel's failure to object to the relevant jury instructions. *E. g., Braxton v. Estelle*, 641 F.2d 392, 394 (5th Cir. 1981); *Holloway v. McElroy*, 632 F.2d 605, 617 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981).[41]

---

**40.** The State cites *Warren v. State*, 369 So.2d 483 (Miss.), *cert. denied*, 444 U.S. 956, 100 S.Ct. 436, 62 L.Ed.2d 328 (1979); *Evans v. State*, 315 So.2d 1 (Miss. 1975); and *Rayburn v. State*, 312 So.2d 454 (Miss. 1975), as support for the proposition that under Mississippi law, specific objections to jury instructions must be made at trial or the objection is waived.

**41.** Washington also suggests that he has demonstrated "cause" and "prejudice" sufficient to escape the *Sykes* rule because *Lockett* was not decided until more than one year after his trial

and because any failure to object was the product of the inadvertence and ineffectiveness of his trial counsel. The precise contours of *Sykes*' "cause" and "prejudice" requirements should soon be clarified by the Supreme Court. *See Isaac v. Engle*, 646 F.2d 1129 (6th Cir. 1980) (en banc), *cert. granted*, —— U.S. ——, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981). In the meantime, we decline to add to the present uncertainty surrounding these requirements. *See generally Tyler v. Phelps*, 643 F.2d 1095, 1100–02 & nn. 8–9 (5th Cir. 1981) (on panel rehearing from 622 F.2d 172 (5th Cir. 1980));

*C. The Standard by Which State-Court Trial Instructions are Judged on Federal Habeas Corpus*

When called upon, in the context of a habeas corpus action brought under 28 U.S.C. § 2254 (1976), to evaluate a jury instruction given by the state trial court, we must pay "careful attention to the words actually spoken to the jury, . . . for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Sandstrom v. Montana*, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979); *see Holloway*, 632 F.2d at 620.

■ To determine accurately the interpretation that a reasonable juror might give to the instruction in question, we cannot examine bits and pieces of the charge in isolation. *E. g., Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–401, 38 L.Ed.2d 368 (1973). Rather, we must "examine the entire charge and determine whether, taken as a whole, the issues and law presented to the jury were adequate." *Davis v. McAllister*, 631 F.2d 1256, 1260 (5th Cir. 1980). *See also Stephens v. Zant*, 631 F.2d 397, 405 (5th Cir. 1980), *modified on other grounds on panel rehearing*, 648 F.2d 446 (5th Cir. 1981) (reviewing instructions in habeas action challenging imposition of death penalty); *United States v. Brooks*, 611 F.2d 614, 619 (5th Cir. 1980).

And even when some deficiency is discovered in the language of the charge taken as a whole, "it must be established not merely that the instruction [was] undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment," and that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 146, 147, 94 S.Ct. at 400. *See also Bryan v. Wainwright*, 588 F.2d 1108, 1110–11 (5th Cir. 1979).

*Holloway v. McElroy*, 632 F.2d at 617 n.23, and cases cited therein.

*D. The Effect of the Challenged Instructions in This Case*

Having determined that we are not barred from considering the merits of Washington's *Lockett* claim, we turn now to an evaluation of the practical effect of the jury instructions—that is, what these instructions told the jury it should and should not do in deciding whether the death penalty should be imposed.[42] After reviewing the entire charge from the sentencing hearing, in addition to that particularly relevant portion quoted above in part III–A of this opinion, we must agree with Washington that a reasonable juror might well have believed that in determining whether any aggravating factors sufficiently outweighed any mitigating factors so as to warrant the imposition of the death penalty, it was his sworn duty to consider *only* the two mitigating factors specifically enumerated in the trial court's charge.

■ We first note that *nowhere* in the trial court's charge to the jury in the sentencing phase of Washington's trial is there any explicit instruction that the jury was free to consider mitigating factors other than Washington's age and lack of a significant history of prior criminal activity. This, of course, is a very significant point in our determination as to whether a reasonable juror might well have believed that his sworn duty was to consider only those two mitigating factors; yet it is not conclusive, for we must look at the charge as a whole to see if other language therein would have led a reasonable juror to infer that he was not so bound.

It is true that the trial court prefaced its explanation of the jury's duty to balance aggravating and mitigating circumstances by pointing out that "[i]n reaching your decision you must obviously consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself." By itself, this language would tend to support an inference that the jury's discretion to consider both mitigating *and aggravating* circumstances

42. In part III–E of this opinion, *infra*, we consider whether these effects violated Washington's constitutional rights.

was wholly unchanneled. This, of course, is not the law, and the remainder of the instruction was obviously calculated to negate any such inference.

In instructing the jury as to the two aggravating factors that were at issue in the case,[43] the trial court quite properly made it clear to the jury that it could consider *only* those two aggravating factors, and no others: "Now *consider only the following elements of aggravation* in determining whether the death penalty should be imposed . . . ." (Emphasis added.) Almost immediately thereafter, in language that almost exactly paralleled that in which the trial court circumscribed the jury's consideration of aggravating factors, the court told the jury to consider the two statutorily prescribed[44] mitigating factors that were at issue in the case: "Now *consider the following elements of mitigation* in determining whether the death penalty should not be imposed . . . ." (Emphasis added.) Unquestionably, a reasonable juror might well infer from this parallel syntax that the enumerated factors—both aggravating and mitigating—were the sole factors that he was permitted to consider in the discharge of his oath. This inference would be further supported by the trial court's elaboration on the juror's duty to balance aggravating against mitigating factors: "If you

find from the testimony that *one or more of the preceding elements of mitigation* exist[s], then you must consider whether *it* outweighs the aggravating circumstances you previously found . . . ." (Emphasis added.)

The State suggests that, to the contrary, the omission of the word "only" from the instruction as to mitigating circumstances would lead a reasonable juror to infer that his consideration of mitigating factors was not limited to those announced by the trial court. Perhaps an extraordinarily attentive juror might rationally have drawn such an inference from the omission of this single word. Indeed, such narrow parsing of language is far from unknown in the related context of judicial interpretation of legislative pronouncements.[45] Nonetheless, at best the State's argument suggests that there is more than one reasonable interpretation of the crucial language in the charge; this does not mean the charge is not constitutionally infirm, for the Supreme Court has held that "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror *could* have interpreted the instruction." *Sandstrom*, 442 U.S. at 514, 99 S.Ct. at 2454 (emphasis added).[46]

Accordingly, we must conclude that a reasonable juror might well have been led

---

**43.** The trial court's charge on these two aggravating circumstances was authorized by Miss. Code Ann. §§ 99–19–101(5)(d), (h) (1980 Supp.).

**44.** The trial court's charge on these two mitigating circumstances was authorized by Miss. Code Ann. §§ 99–19–101(6)(a), (g) (1980 Supp.).

**45.** In *Lockett*, for example, the plurality opinion pointed out that although "the Florida statute approved in *Proffitt [v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 916 (1976),] contained a list of mitigating factors, six Members of this Court assumed, in approving the statute, that the range of mitigating factors listed in the statute was not exclusive." 438 U.S. at 606, 98 S.Ct. at 2965. This assumption, according to the *Lockett* plurality, had been based on the fact that "the Florida statute 'provides that "[a]ggravating circumstances shall be limited to . . . [eight specified factors]" ' and that there was 'no such limiting language in the list of statutory mitigating factors.' " 438 U.S. at 606 & n.15, 98 S.Ct. at 2966 & n.15 (quoting

*Proffitt*, 428 U.S. at 250 n.8, 96 S.Ct. at 2965–66 n.8; emphasis, elipsis, and bracketed portion by *Proffitt* Court).

In *Spinkellink v. Wainwright*, 578 F.2d at 582, 620–21 (1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), we relied on the *Lockett* Court's analysis of its earlier discussion of the Florida statute in *Proffitt* in rejecting a *Lockett* attack on that statute. We also noted that Spinkellink "was afforded, and exercised, without limitation, every opportunity to set forth any and all mitigating factors in his favor," including nonstatutory mitigating factors such as provocation. *Id.* at 621. Apparently, Spinkellink did not contend that the trial court's charge impermissibly limited the jury's *consideration* of those nonstatutory mitigating factors. Accordingly, *Spinkellink* has no direct bearing on the case at bar.

**46.** This would seem to be especially true in a capital case, given the degree of precision required in channeling the jury's sentencing discretion. See part III–E of this opinion, *infra.*

to believe from the trial court's charge that in determining whether the aggravating factors sufficiently outweighed the mitigating factors so as to warrant the imposition of the death penalty, it was his sworn duty to consider *only* the two mitigating factors specifically enumerated in the charge. We now must explore the legal ramifications of this conclusion.

### E. The Merits of Washington's Lockett Claim

*1. The Lockett decision.*—In the three years since the Supreme Court decided *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), there have been surprisingly few occasions for the Court or the lower federal courts to amplify upon that precedent. In evaluating Washington's *Lockett* claim, therefore, we must be guided for the most part by that decision alone, although we may profitably draw much from the surrounding context of the Court's prior and subsequent pronouncements on the subject of capital punishment.

An Ohio jury convicted 21-year-old Sandra Lockett of capital murder for her role in the armed robbery of a pawnshop.[47] Under then-current Ohio law, Lockett was to receive a sentence of death unless the trial judge found by a preponderance of the evidence one of three statutory mitigating circumstances: that the victim induced or facilitated the murder; that the defendant acted under duress, coercion, or strong provocation; or that the offense was primarily the product of psychosis or mental deficiency insufficient to constitute legal insanity. Lockett introduced evidence relating to her character and history (*e. g.*, her youth, good character, lack of a prior record of violent crime, and excellent prospects for rehabilitation) and the circumstances of the offense (*e. g.*, that she had had no part in the actual killing and only a

minor role in the robbery, and that the shooting appeared to have been accidental); she argued that these factors made the death penalty inappropriate. The trial judge, however, found that none of the statutory mitigating circumstances was present, and sentenced Lockett to death. The conviction and sentence were upheld by the Ohio Supreme Court. The United States Supreme Court reversed Lockett's death sentence, holding that the Ohio death penalty statute was unconstitutional under the Eighth and Fourteenth Amendments.

Although recognizing that the signals sent by the Court's recent death penalty cases had not "always been easy to decipher," 438 U.S. at 602, 98 S.Ct. at 2963, Chief Justice Burger's plurality opinion began by reviewing the plurality opinions of the Court's 1976 death penalty cases.[48] The Chief Justice discerned from those cases an intent that sentencing discretion in death penalty cases not be eliminated altogether, but only " 'directed and limited' . . . so that the death penalty would be imposed in a more consistent and rational manner and so that there would be a 'meaningful basis for distinguishing the . . . cases in which it is imposed from . . . the many cases in which it is not.' " Id. at 601, 98 S.Ct. 2963 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 188, 96 S.Ct. 2909, 2931, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

The Chief Justice stressed, however, that the plurality in the 1976 cases had recognized "that the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death,' . . . in order to ensure the reliability, under the Eighth Amendment standards, of the determination that 'death is the appropriate

47. Lockett had remained outside while accomplices entered and robbed the pawnshop, and hence was not present at the actual shooting. Nonetheless, Ohio's statutory felony murder rule and aiding and abetting statute permitted the jury to find intent to kill on the part of an accomplice who had taken any part in a life-threatening crime.

48. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 916 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

punishment in a specific case.'" *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304, 305, 96 S.Ct. 2978, 2991, 2992, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

Continuing, the Chief Justice reiterated that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id.* at 604, 98 S.Ct. at 2964. "Given that the imposition of death by public authority is so profoundly different from all other penalties," the Chief Justice found that he could not "avoid the conclusion that an individualized decision is essential in capital cases." *Id.* at 605, 98 S.Ct. at 2965.

> There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

*Id.*[49] Accordingly, Chief Justice Burger concluded that

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the

rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Id.* at 604, 98 S.Ct. at 2964 (emphasis in original).[50] Applying this holding, the Chief Justice observed that the Ohio statute at issue allowed the sentencing authority to consider the nature and circumstances of the offense and the history, character, and conditions of the offender—but only to the extent that evidence of these factors had a bearing on the three narrowly defined statutory mitigating circumstances. *Id.* at 608, 98 S.Ct. at 2966. Because "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors," *id.,* Chief Justice Burger concluded that the statute was incompatible with the Eighth and Fourteenth Amendments.

Only Justices Stewart, Powell, and Stevens joined in the Chief Justice's opinion in *Lockett.* In one of the two occasions on which this court has construed *Lockett,* however, we noted that it would seem that "a death sentence imposed by a sentencer barred from considering mitigating circumstances will be vacated by a six-member majority of the Supreme Court." *Chenault v. Stynchcombe,* 581 F.2d 444, 448 (5th Cir. 1978).[51] Accordingly, for present purposes we must treat the Chief Justice's plurality

---

**49.** This paragraph was quoted with approval in Justice Stevens' opinion for a majority of the Court in *Beck v. Alabama,* 447 U.S. 625, 638 n.13, 100 S.Ct. 2382, 2389–90 n.13, 65 L.Ed.2d 392 (1980).

**50.** The Chief Justice "express[ed] no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder." 438 U.S. at 604 n.11, 98 S.Ct. at 2964–65 n.11.

**51.** We noted in *Chenault* that although Justice Marshall continued in *Lockett* to adhere to his view that capital punishment is always unconstitutional, he "appears to have suggested that the sentencer must be allowed to consider 'the unique individuality of every criminal defendant.'" 581 F.2d at 447 (quoting *Lockett,* 438

U.S. at 621, 98 S.Ct. at 2973 (Marshall, J., concurring in the judgment)). We noted, too, that while Justice Brennan did not participate in either *Lockett* or a companion case decided on the basis of *Lockett* (*Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978)), he has consistently maintained that the death penalty is always unconstitutional. 581 F.2d at 448.

Further, Justice Blackmun's concurring opinion in *Lockett* asserted that the State had to allow the sentencer to consider a defendant's noninvolvement in the actual killing and the degree of his mens rea—a partial embrace of the Chief Justice's position. *See* 438 U.S. at 613–17, 98 S.Ct. at 2969–2971 (Blackmun, J., concurring in part and concurring in the judgment). Only Justices White and Rehnquist expressly rejected the Chief Justice's reasoning, although Justice White found other constitu-

opinion as if it represents the views of a majority of the Court.[52]

2. *Lockett's application to the case at bar.*—Given our holding above in part III–D of this opinion, we must agree with Washington that the challenged jury instructions prevented the sentencer's consideration of nonstatutory mitigating factors in essentially the same manner as did the Ohio statute struck down by the *Lockett* court. Washington's sentencer was precluded from considering as mitigating factors all but two of the aspects of Washington's character and record and the circumstances of the offense that he proffered as a basis of a sentence less than death. Unless there is some meaningful distinction between Washington's case and that of Sandra Lockett, then, Washington's sentence of death cannot stand.

The most obvious difference between *Lockett* and the case at bar lies in the fact that Washington does not challenge on *Lockett* grounds the facial constitutionality of the state death penalty statute under which he was convicted.[53] His challenge is a far more narrow one, reaching only the particular jury instructions given in his case. Nonetheless, we conclude that this distinction does not undercut Washington's argument.

■ The Supreme Court has repeatedly emphasized the importance of proper jury instructions in capital cases:

> Explaining that sentencer awareness of comprehensive, accurate information about the defendant is essential to a reliable and individualized sentencing determination [*see Jurek v. Texas*, 428 U.S. 262, 271 [96 S.Ct. 2950, 2956, 49 L.Ed.2d 929] (1976); *Gregg*, 428 U.S. at 189–92, 96 S.Ct. at 2932–34], the plurality [in the 1976 cases] observed that merely providing the jury with the evidence may not be

tional flaws in the statute (see note 39 *supra*) that required that Lockett's sentence be vacated. *See* 438 U.S. at 622–24, 98 S.Ct. at 2982–83 (White, J., concurring in part, dissenting in part, and concurring in the judgment); *id.* at 628–33, 98 S.Ct. at 2973–76 (Rehnquist, J., concurring in part and dissenting in part). *See also* Hertz & Weisberg, *In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances*, 69 Cal.L.Rev. 317, 325 n.43 (1981).

Thus, even discounting Justice Stewart's recent resignation from the Court, it would appear that a majority of the Justices would condemn on one or another ground a death sentence imposed in violation of the plurality opinion in *Lockett*.

**52.** As the commentators have noted, however, "[t]he *Lockett* Court's discussion of [the defendant's right to have the sentencing authority "consider" any proffered aspect of his character, record, or offense] is all too brief, and leaves its application ... unclear. The decision merely announces the existence of the requirement and applies it to the facts of the case." Hertz & Weisberg, *supra* note 51, at 326. Neither have the later decisions of the Court shed any further light on the *Lockett* independent mitigating weight requirement. *See id.* at 326–27 & n.51.

Hertz and Weisberg, however, argue persuasively that the *Lockett* rule is well grounded in the 1976 plurality opinions. Insofar as it requires that a jury, as a significant and objective index of contemporary community values, give individualized consideration to any miti-

gating factors that relate to the defendant before it, the *Lockett* rule serves to protect two related values that were emphasized in those opinions: (1) It ensures that an individual death sentence is consistent with public attitudes and evolving standards of decency. (2) It ensures that capital defendants are treated as unique human beings, with appropriate consideration given to whether imposition of the death penalty in the particular case would further the retributive and deterrent values in whose absence capital punishment would not comport with the dignity of man. *See id.* at 333–37.

**53.** In Washington's direct appeal, the Mississippi Supreme Court apparently treated Washington's *Lockett* arguments as a challenge both to the statute and to the jury instructions in his case. The court interpreted Miss.Code Ann. § 99–19–101(1) (1980 Supp.) to mean that "the only limitation placed on the introduction of evidence of mitigating circumstances is that it must be *reasonably relevant.*" 361 So.2d at 68 (emphasis in original). While the court discussed the instructions given by the trial court at Washington's trial, however, it did not directly rebut Washington's argument that the jury instructions in his case had precluded the jury's consideration of nonstatutory mitigating factors.

We emphasize that we express no views whatsoever as to whether the Mississippi death penalty statute is in any way facially deficient under *Lockett*.

sufficient, since jurors have little experience in sentencing and are unskilled in absorbing and applying sentencing information. [*Gregg*, 428 U.S. at 192, 96 S.Ct. at 2934.] The jury must therefore receive "guidance in its decisionmaking," particularly as to the types of factors that are relevant to the sentencing decision and the proper means for applying these factors to the determination of sentence. [*Id.* at 192–93, 195, 96 S.Ct. at 2934, 2935.] The plurality concluded that jury instructions are an indispensible mechanism for providing this type of guidance to a capital sentencing jury. [*Id.* at 193–95, 96 S.Ct. at 2934–35.]

Hertz & Weisberg, *In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances*, 69 Cal.L.Rev. 317, 344 (1981) (footnotes omitted). And the *Lockett* plurality did not restrict its holding to statutes. Rather, it first announced a general rule—that "the sentencer ... [must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," 438 U.S. at 604, 98 S.Ct. at 2964—and then applied that rule to the Ohio statute, *id.* at 606–08, 98 S.Ct. at 2965–67. Accordingly, we recognized in *Chenault v. Stynchcombe*, 581 F.2d at 448, that *Lockett* "mandate[s] that the judge clearly instruct the jury about mitigating circumstances and the option to recommend against death," for *Lockett*'s "constitutional requirement to allow consideration of mitigating circumstances would have no importance, of course, if the sentencing jury is unaware of what it may consider in reaching its decision." [54] Thus, there is no doubt but that Washington may properly raise his *Lockett* argument through a challenge to the instructions given by the trial court to the jury that convicted him.[55]

In rejecting Washington's *Lockett* argument, the district court noted that the trial court excluded no evidence that was offered in mitigation, and concluded that "the jury was free to consider all mitigating evidence which [Washington] saw fit to offer." Similarly, the State argues that

---

**54.** The constitutional requirement that juries be given instructions detailing their discretionary power to refuse to impose the death penalty stands in sharp contrast to the prevailing law on the topic of "jury nullification"—that is, the jury's exercise of its "power to bring in a verdict [of acquittal] in the teeth of both law and facts," *Horning v. District of Columbia*, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920) (per Holmes, J.). A jury, acting as a "community conscience" in disregarding the strict requirements of the law when it finds that those requirements cannot justly be applied in a particular case, undoubtedly possesses this power each time it determines a defendant's guilt or innocence; that power, of course, is not limited to capital cases, but extends to determinations of guilt or innocence in all criminal cases. The courts that have considered the question, however, have almost uniformly held that a criminal defendant is not entitled to an instruction that points up the existence of that practical power to his jury. *Compare United States v. Dougherty*, 473 F.2d 1113, 1130–37 (D.C.Cir.1972) (eloquent explanation of why a defendant is not entitled to instruction on jury nullification), *with id.* at 1139–44 (Bazelon, C. J., concurring in part and dissenting in part) (eloquent argument as to why a defendant should be entitled to such an instruction, or at least to argue the theory of jury nullification to the jury). *See also United States v. Wiley*, 503 F.2d 106, 107 & n.4 (8th Cir. 1974) (surveying the federal court cases supporting its holding that defendant not entitled to jury nullification instruction).

Jury nullification, of course, goes to the question of whether a defendant will, on the one hand, be found guilty and be punished according to the strict dictates of the law, or, on the other, be forever free from *any* legal consequences of his criminal act. By marked contrast, when a jury declines to impose the death penalty upon one already convicted of a capital crime, the jury's exercise of community conscience and norms ordinarily will not result in the defendant being set free. In Mississippi, for example, the jury's sentencing alternatives for a capital offense are limited solely to capital punishment and life imprisonment. *See* Miss. Code Ann. §§ 99–19–101(2), 99–19–103 (1980 Supp.).

**55.** The State wisely concedes this point in its brief: "We concur with petitioner that an instruction emanating from the lips and pen of the trial court could inflict the same fatal trauma that the Ohio statute inflicted in *Lockett*. Any substantial judicial restraint imposed upon the sentencing authority would appear to be no less decisive on the Eighth Amendment question than a statutory impediment."

Washington's counsel introduced some evidence of nonstatutory mitigating factors, and adverted to those factors in his closing argument. Both the district court's analysis and the State's argument on appeal, however, completely miss the point of the Supreme Court's holding in *Lockett*. Sandra Lockett also introduced evidence of nonstatutory mitigating factors, and also argued their relevance to the sentencer. The fatal flaw in *Lockett* was not the exclusion of evidence relating to nonstatutory mitigating factors, but the limitation on the sentencer's consideration of that evidence except as it related to the statutory mitigating factors.

Neither should Washington's *Lockett* challenge fail because his counsel adverted to nonstatutory mitigating circumstances during closing argument. As the Supreme Court has noted in a related context, "arguments of counsel cannot substitute for instructions by the court." *Taylor v. Kentucky*, 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936–37, 56 L.Ed.2d 468 (1978) (concluding that trial court's omission of instruction on presumption of innocence was not remedied by defense counsel's explanation of the presumption in opening and closing argument). Only an instruction from the trial court can invest a particular concept—here the jury's ability to consider nonstatutory mitigating factors—with the authority of the court. *See id.* at 489, 98 S.Ct. at 1936–37. Indeed, were a jury to consider nonstatutory mitigating factors despite instructions by the court to the effect that it was duty-bound to consider only the two statutory mitigating circumstances, it would be acting "lawlessly," *see Woodson v. North Carolina*, 428 U.S. at 303, 96 S.Ct. at 2990 (opinion of Stewart, Powell, and Stevens). "There is an element of capriciousness in making the jurors' power to avoid the death penalty

dependent on their willingness to accept [an] invitation to disregard the trial judge's instructions." *Roberts v. Louisiana*, 428 U.S. 325, 335, 96 S.Ct. 3001, 3007, 49 L.Ed.2d 974 (1976) (opinion of Stewart, Powell, and Stevens).

The State also contends that the nonstatutory mitigating circumstances which Washington argues were removed from the jury's consideration "were not reasonably likely to generate any sympathetic consideration from the tribunal." The State argues that "the fact that [Washington] had carried on a 'steady domestic relationship' with a woman not his wife and had fathered, by her, a three year old female child is not altogether an ironclad or otherwise viable mitigating factor bespeaking [Washington's] good moral character." Further, the State argues that evidence indicating that Washington had held no fewer than eight different jobs would have impelled the jury to the same conclusion that was reached by the trial judge in his post-sentencing report—that "the defendant had a poor work record."

This argument, however, goes to the *weight* that the jury would have accorded to the nonstatutory mitigating factors, rather than to whether the jury could properly have considered them in its calculations. The jury could just as easily have reached diametrically opposite conclusions from those suggested by the State, had it been allowed by the trial court's instructions to consider nonstatutory mitigating factors. For example, the jury might rationally have concluded that the two statutory mitigating circumstances (Washington's relative youth and lack of a significant record of prior criminal activity), when combined with various objective, articulable nonstatutory mitigating circumstances [56] (such as Washington's steady domestic rela-

---

**56.** The State argues that two of the nonstatutory mitigating factors upon which Washington premises his argument—that Washington's child and girlfriend depended upon him for financial and other support, and that the shooting was not deliberate or intentional because the victim repeatedly grabbed for Washington's gun and moved threateningly toward him just prior to the shooting—are not supported by the record. Specifically, the State contends that

the record contains no evidence that Washington's child and girlfriend were dependent upon him, and that, because of a peculiarity in the trial court's charge in the guilt phase of the trial, the jury's verdict conclusively established that Washington acted wilfully with premeditated and deliberate design. Given our disposition above, we need not reach these contentions.

tionship, his role as a father, and his employment history [57]), *together* sufficiently outweighed the aggravating circumstances so as to make life imprisonment a more appropriate and just punishment for Washington's crime than death.

In short, under *Lockett,* the error in the trial court's proscription of jury consideration of nonstatutory mitigating circumstances was one of constitutional proportions that violated rights secured to Washington under the Eighth and Fourteenth Amendments; given that the entire purpose of the sentencing proceedings was to determine and balance aggravating against mitigating circumstances, that error unquestionably so infected the sentencing proceedings as to drain them of fundamental fairness. While one may argue about the precise degree to which Washington was prejudiced by this error, we cannot conclude that it was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[58] Accordingly, the State may not

---

**57.** Equally as important may be the jury's subjective, unarticulable perceptions of Washington. In their separate opinions in *Lockett,* Justices White and Rehnquist argued that the plurality was returning to the unguided jury discretion condemned in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See* 438 U.S. at 622–23, 98 S.Ct. at 2982–83 (White, J., concurring in part and in the judgment and dissenting in part); *id.* at 631, 98 S.Ct. at 2974–75 (Rehnquist, J., concurring in part and dissenting in part). Some commentators have concluded from *Lockett* that "[t]he concern with capriciousness, the worry that when most offenders receive mercy the condemned few will die senselessly, no longer figures significantly in the Court's decisions." *The Supreme Court, 1977 Term,* 92 Harv.L.Rev. 57, 106–07 (1978).

However, the *Gregg* plurality was careful to note that "[n]othing in any of our [death penalty cases] suggests that the decision to afford an individual defendant mercy violates the Constitution." 428 U.S. at 199, 96 S.Ct. at 2937. The exercise of mercy, of course, can never be a wholly rational, calculated, and logical process. From these premises, other commentators have argued that "*Lockett* is entirely consistent with *Furman* and the 1976 Cases, because it grants broad sentencer discretion only on the mitigating and not on the aggravating side of the sentencing equation." Hertz & Weisberg, *supra* note 51, at 374. To amplify:

> The *Gregg* decision essentially holds that the state cannot execute a defendant unless it establishes, according to constitutionally sufficient criteria of aggravation and according to constitutionally mandated procedures, that capital punishment is appropriate for that defendant. Nothing in *Gregg,* however, requires the state to execute defendants for whom such a finding is made. The sentencing authority can find that mitigating circumstances established by defense evidence outweigh such aggravating factors. It can also invoke whatever standards it wishes—objective or otherwise—to nullify the significance of any state proof of aggravation.

*Id.* at 375 (footnote omitted). In this view, *Lockett* does indeed create an asymmetry in the channeling of jury sentencing discretion. That asymmetry is offensive, however, only if one assumes that the grant of mercy to some, based on their particularized circumstances, somehow abridges the constitutional rights of others whose particular circumstances do not inspire mercy. It may well be that the *Lockett* plurality does not share that assumption with Justices White and Rehnquist.

In the case at bar, we need not decide whether the *Lockett* rule applies when there are no objective, articulable nonstatutory mitigating factors. The factors that Washington *has* articulated are sufficient to make further inquiry along these lines unnecessary.

**58.** We cannot agree with the State's suggestion that before a habeas petitioner is entitled to prevail on *Lockett* grounds, the mitigating factors excluded from the jury's consideration must be as compelling as those excluded from jury consideration in *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam), which represents one of the Supreme Court's few applications of the *Lockett* rule. In *Green,* Georgia's hearsay rule resulted in the exclusion of hearsay testimony in which the out-of-court declarant, who was an accomplice of Green's, had said that Green was not present at and had not participated in the victim's death.

Relying on both *Lockett* and *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("the hearsay rule may not be applied mechanistically to defeat the ends of justice"), the Supreme Court reversed Green's conviction with only one paragraph of analysis. The Court appeared to base its decision solely on the facts that the excluded testimony was highly relevant under *Lockett* and that substantial reasons existed to assume its reliability. *See* 442 U.S. at 97, 99 S.Ct. at 2152. We find no support in *Green* for the State's suggestion that *Lockett* applies only when the nonstatutory mitigating factors that have been excluded from jury consideration are especially compelling; neither does *Green* indicate that *Lockett* is limited to those situations

constitutionally impose upon Washington a sentence of death on the basis of the sentencing proceedings at issue in this case.

The practical impact of our holding should be relatively narrow. Counsel for the State indicated in argument in the court below that he has recommended to Mississippi prosecutors that they ensure that the jury instructions in capital cases do not limit the jury's consideration to statutory mitigating circumstances.[59] The use of such nonlimiting instructions has been approved by the Mississippi Supreme Court subsequent to Washington's trial and direct appeal. *See Gray v. State*, 375 So.2d 994, 1003–04 (Miss.1979) (en banc) (approving instruction that jury was to consider as a mitigating circumstance "[a]ny other matter [besides the statutory mitigating circumstances] brought before you which you deem to be mitigating on behalf of the Defendant"), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). And, of course, whether a given set of instructions operates so as to preclude the jury's consideration of nonstatutory mitigating factors

will depend on how a reasonable juror could have interpreted the language of that specific charge.

Finally, it bears emphasis that we do not here decide whether constitutional error would inhere in a trial court's failure specifically to instruct the jury in a capital case that it was free to consider nonstatutory mitigating factors;[60] our holding is limited to the circumstances of the case at bar, in which the trial court's charge was not silent on the issue, but operated affirmatively to preclude jury consideration of nonstatutory mitigating factors.[61]

## IV. CONCLUSION

For the reasons set forth above in part II of this opinion, we conclude that Washington was not denied effective assistance of counsel in the guilt phase of his trial. Accordingly, we affirm the district court's judgment insofar as it declined to grant habeas relief that would have resulted in Washington's retrial on the issue of his guilt or innocence.

---

in which defense counsel has been precluded from even alluding to the nonstatutory mitigating factors. As the Court's brief treatment indicates, the facts in *Green* simply indicated a more egregious violation of the *Lockett* rule than the facts of *Lockett* itself.

59. In response to questioning from the court below as to whether the Constitution requires that the trial court's charge in a capital case specifically instruct the jury that it may consider nonstatutory mitigating factors, counsel for the State responded as follows:

I don't think that is a constitutional necessity. I have advocated all along, or have been of the belief all along that it would not be unwise for the prosecutors or state to submit an instruction, mitigating circumstances you may consider, something to this effect or consider the following mitigating circumstances and then list the ones that have been brought out by the evidence and *add another one to the effect of other mitigating circumstances that you, the jury, feel may be reasonably relevant to the issue of life or death.*

(Emphasis added.)

60. It is true that in *Chenault v. Stynchcombe*, 581 F.2d 441, 448 (5th Cir. 1978), we stated that "[w]e read *Lockett* and *Bell*, then, to mandate that the judge clearly instruct the jury about

mitigating circumstances and the option to recommend against death." Nonetheless, that case did not present the question of whether constitutional error would inhere in a trial court's failure specifically to instruct the jury in a capital case that it could consider nonstatutory mitigating factors; in fact, the above-quoted language in *Chenault* does not directly refer to nonstatutory mitigating factors. Accordingly, this question must be considered an open one in the Fifth Circuit, and we expressly and emphatically decline to express an opinion thereupon.

61. The Missouri Supreme Court, we note, has taken the position that jury instructions in capital cases should, in addition to listing statutory mitigating factors, indicate simply that the jury may consider all of the evidence relating to the offense in connection with mitigation. While this instruction would, in the Missouri Supreme Court's view, allow jury consideration of mitigating factors that are not "authorized by law," the court has indicated that "no instruction should be given calling the jury's attention" to this fact. *See* 44 Mo.L.Rev. 359, 368–69 & n. 64 (1979). The Mississippi Supreme Court apparently has not yet addressed this question, and neither do we.

For the reasons set forth above in part III of this opinion, however, we conclude that the process by which the State secured a death sentence for Washington's crime was constitutionally flawed because the jury was precluded from considering non-statutory mitigating factors in violation of the Supreme Court's *Lockett* decision.[62] Accordingly, we reverse the district court's judgment insofar as it denied Washington habeas corpus relief that would secure him from the execution of the death sentence returned in his 1977 trial.

No party has as yet briefed or argued the question of the precise scope of habeas relief necessary, given that we have found constitutional error only in the sentencing phase of Washington's trial. In the first instance, Mississippi law would govern the various alternatives available to the state— *i. e.*, whether Washington could be resentenced to a sentence other than the death penalty on the basis of this conviction, or whether the State could seek a new death sentence from a jury convened solely for resentencing, or whether the State could seek a new death sentence only after retrying the issue of Washington's guilt as well.[63] There may, however, be federal constitutional overtones to any such decision based on Mississippi law. Accordingly, while we remand this case with instructions that the district court shall enter judgment granting appropriate habeas relief in accordance with this opinion, we leave it to the district court to determine, after briefing and argument by the parties, the precise form of such relief.[64]

AFFIRMED IN PART; REVERSED IN PART and REMANDED.

COLEMAN, Circuit Judge, dissenting.

If ever a coldblooded murder, committed in the course of a coldblooded robbery, deserved the death penalty this is it. The Supreme Court refused to interfere (441 U.S. 916, 99 S.Ct. 2016, 60 L.Ed.2d 388). Chief District Judge Keady denied habeas corpus relief. Now, this Court marches Washington out of the gas chamber on the entirely untenable argument that the trial judge violated the federal constitution in his Instruction No. C–20 and that a jury *might* have considered Washington's irresponsible attitude toward the rules of society, and his violation of the law and his self-indulgent procreation of an illegitimate child as a *mitigating factor* in prescribing the penalty for this inexcusable murder committed during the course of a callously planned robbery. With deference, I believe that the majority is bad wrong on both points.

**62.** Given our conclusions with respect to Washington's *Lockett* argument, we do not reach his other arguments as to why the district court's judgment with respect to Washington's sentence should be reversed: that the court erred in failing to hold an evidentiary hearing on Washington's claim that his death sentence was the product of racial discrimination; that the Mississippi courts' refusal further to define or delimit the "heinous, atrocious or cruel" aggravating circumstance of Miss. Code Ann. § 99–19–101(5)(h) (1980 Supp.) rendered that circumstance unconstitutionally vague and overbroad; and that the death penalty is unconstitutionally disproportionate in this case because there has been no finding that Washington deliberately took the life of another person.

**63.** *Cf.* Miss.Code Ann. § 99–19–107 (1980 Supp.) ("[i]n the event the death penalty is held to be unconstitutional by the Mississippi Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death … shall sentence such person to imprisonment for life, and such person shall not be eligible for work release or parole"); Miss.Code Ann. § 99–19–101(1) (1980 Supp.) ("[i]f, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty"). We express no opinion as to whether either or both of these statutes may be relevant to this question.

**64.** In the event that either Washington or the State challenges the precise form of relief granted by the district court, any appeal from the district court's newly-entered judgment shall be referred to this panel. *See United States v. Gaston*, 608 F.2d 607, 614 & n. 3 (5th Cir. 1979).

## I

*The Instruction was not Unconstitutionally Erroneous*

In the opening portion of the instruction the jury was told that it must "*consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself* (emphasis added)."

Chief Judge Keady held that the state trial court had committed no error of a constitutional nature:

"Specifically, the jury was not precluded from considering all mitigating factors shown by the evidence, whether or not they were directly brought to the attention by the court's instruction C–20. It is to be noted that the court excluded no evidence which was offered in mitigation, and that instruction C–20, while it expressly required the jury to 'consider only' one or more of the two pertinent statutory aggravating circumstances before voting the death penalty, did not restrict the jury to considering *only* petitioner's lack of significant history of prior criminal activity and his age as mitigating circumstances. Moreover, this instruction was not objected to at trial, and under it the jury was free to consider all mitigating evidence which petitioner saw fit to offer."

This instruction was not given until the jury had heard every extenuating word offered on behalf of the defendant. None of it was excluded. The majority concedes that, indeed, every bit of it was argued to the jury.

Competent counsel did not object to the instruction or any part of it. It is obvious that everybody understood what the instruction meant and that the issue of mitigation was presented accordingly.

The majority concedes that the law requires that instructions be considered as a whole but nevertheless attempts to separately and individually parse the various parts of this instruction in isolation, all in the attempt to hoist the murderer out of the gas chamber on an invisible non-existent web.

I cannot agree to thwarting a death penalty in such a manner.

## II

*There was no Mitigation in what the Majority Chooses to Assert "Might Have Been" Mitigating*

Since April 5, 1956, it has been legally impossible for a person to contract a common law marriage in Mississippi. Such marriages are *absolutely void*.[1] For over a hundred years it has been a violation of Mississippi law for individuals to unlawfully cohabit, whether in adultery or fornication.[2] Neither society nor Mississippi law has ever favored the procreation of illegitimate children by self-indulgent fathers.

All this being so, I simply cannot understand how the majority holds that violating the law by living together in an illegal relationship and fathering an illegitimate daughter "might be" a mitigating factor in a coldly planned robbery wherein the defendant chose to shoot the victim's entrails out and then coolly reloaded his shotgun as if he had done no more than kill a rabbit.

The only sensible conclusion is that the jury of citizens believed that Washington had shown no more regard for human life than he had for the views of society or the laws to which he had theretofore paid no attention, including the law against the possession of marijuana.

This is a sad day for Mississippi's efforts to adequately punish a fiendish murder. Indeed, it is a sad day for Mississippi's efforts to enforce any of the criminal laws for which it has exclusive jurisdiction.

I respectfully dissent and I am constrained to express the hope that the State

---

1. Chapter 239, Miss.Laws 1956; Section 93–1–15, Mississippi Code 1972.

2. Chapter 64, Art. 1, Hutchinson's Mississippi Code of 1848; Section 97–29–1, Mississippi Code 1972.

will seek en banc review of so much of this decision as voids the death penalty.